In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1806

BRYANA BIBLE,
Individually and on Behalf of the
Proposed Class,

*Plaintiff-Appellant*,

*v.*

UNITED STUDENT AID FUNDS, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 13-CV-00575-TWP-TAB — **Tanya Walton Pratt**, *Judge*.

ARGUED OCTOBER 2, 2014 — DECIDED AUGUST 18, 2015

Before FLAUM, MANION, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Plaintiff Bryana Bible obtained a
student loan under the Federal Family Education Loan Pro-
gram. She defaulted in 2012 but promptly agreed to enter
into a rehabilitation agreement that required her to make a
series of reduced monthly payments. She timely made all of
the payments that were required of her under this agree-

ment, and she remains current on her loan payments. Although Bible complied with her obligations under the repayment agreement, a guaranty agency assessed over $4,500 in collection costs against her.

The terms of Bible's loan were governed by a form document known as a Federal Stafford Loan Master Promissory Note (MPN). This form has been approved by the U.S. Department of Education and is used in connection with many student loans across the country. The MPN incorporates the Higher Education Act and its associated regulations. In pertinent part, the MPN provides that Bible must pay "reasonable collection fees and costs, plus court costs and attorney fees" if she defaults on her loan. As we will see, "reasonable collection fees and costs" are defined by regulations issued by the Secretary of Education under the authority expressly conferred by the Higher Education Act. The MPN provided that Bible would owe only those collection costs that are permitted by the Higher Education Act and its regulations.

Bible sued the guaranty agency (defendant United Student Aid Funds, Inc.) alleging breach of contract and a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* Her breach of contract theory is that the MPN incorporated federal regulations that prohibit the guaranty agency from assessing collection costs against her because she timely entered into an alternative repayment agreement and complied with that agreement. Her RICO claim alleges that the guaranty agency, in association with a debt collector and a loan service provider, committed mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 when it assessed collection costs of more than $4,500 against her despite its repre-

sentations that her "current collection cost balance" and "current other charges" were zero and that these costs would be "reduced" once she completed the rehabilitation process.

The district court granted the guaranty agency's motion to dismiss Bible's first amended class action complaint (we call this the "amended complaint") under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief. The district court held that both claims were "preempted" by the Higher Education Act. It reasoned that both claims depend on alleged violations of the Act and should not be permitted because the Act does not provide a private right of action. The district court held in the alternative that the amended complaint failed to state a claim that is plausible on its face. It concluded that the breach of contract claim failed because both the MPN and the Higher Education Act expressly permit imposing collection costs against borrowers who default on their loans. The district court also concluded that the RICO claim failed because Bible's amended complaint "has not shown participation in a scheme to defraud; commission of an act with intent to defraud; or the use of mails or interstate wires in furtherance of a fraudulent scheme." *Bible v. United Student Aid Funds, Inc.*, No. 1:13-CV-00575-TWP-TAB, 2014 WL 1048807, at *10 (S.D. Ind. Mar. 14, 2014).

We reverse. Neither of Bible's claims is preempted by the Higher Education Act. Bible's state law breach of contract claim is not preempted because it does not conflict with federal law. The contract at issue simply incorporates applicable federal regulations as the standard for compliance. Accordingly, the duty imposed by the state law is precisely congru-

ent with the federal requirements. A state law claim that does not seek to vary the requirements of federal law does not conflict with federal law.

We apply the Secretary of the Education's interpretation of the applicable statutes and regulations, which is consistent with Bible's. (The Secretary accepted our invitation to file an *amicus* brief addressing the question.) The Secretary interprets the regulations to provide that a guaranty agency may not impose collection costs on a borrower who is in default for the first time but who has timely entered into and complied with an alternative repayment agreement. Nor is Bible's RICO claim preempted. RICO is a federal statute and thus is not preempted by another federal statute, and we see no conflict between RICO and the Higher Education Act. On the merits, both the breach of contract and RICO claims satisfy the plausibility standard under Rule 12(b)(6).

I.   *Factual and Procedural Background*

We review *de novo* a district court's decision to grant a motion to dismiss under Rule 12(b)(6). E.g., *CEnergy-Glenmore Wind Farm No. 1, LLC v. Town of Glenmore*, 769 F.3d 485, 487 (7th Cir. 2014). We accept as true all factual allegations in the amended complaint and draw all permissible inferences in Bible's favor. E.g., *Fortres Grand Corp. v. Warner Bros. Entertainment Inc.*, 763 F.3d 696, 700 (7th Cir. 2014). To avoid dismissal under Rule 12(b)(6), Bible's amended complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the de-

fendant is liable for the misconduct alleged." *Id.* "Plausibility" is not a synonym for "probability" in this context, but it asks for "more than a sheer possibility that a defendant has acted unlawfully.'" *Olson v. Champaign County*, 784 F.3d 1093, 1099 (7th Cir. 2015), quoting *Iqbal*, 556 U.S. at 678.

In deciding a Rule 12(b)(6) motion, the court may consider documents attached to a complaint, such as contract documents, without converting the motion into one for summary judgment. See Fed. R. Civ. P. 10(c). Bible attached the following documents to her amended complaint: (1) the promissory note or MPN, (2) an April 12, 2012 letter to Bible from General Revenue Corp. (GRC), which we call the "default letter," (3) an application for loan rehabilitation sent by GRC on April 27, 2012, which we call the "rehabilitation agreement," (4) a copy of Bible's payment history with the defendant guaranty agency United Student Aid Funds, Inc., and (5) a copy of a contract between USA Funds and Sallie Mae Corp.[1]

---

[1] Bible also attached to her amended complaint a legal brief filed by the Secretary of Education in *Educational Credit Mgmt. Corp. v. Barnes*, No. NA 00-0241-C-B/S (S.D. Ind.); GRC's interrogatory responses in *Bible v. General Revenue Corp.*, No. 12-CV-01236 (D. Minn.), and a June 26, 2008 newspaper article from *The Chronicle of Higher Education* concerning a contract between USA Funds and Sallie Mae. The brief was included as persuasive authority on a legal question. These two exhibits are not evidence, of course. When offered by a party opposing a Rule 12(b)(6) motion, however, and without converting the motion to one for summary judgment, such documents may be used to illustrate facts the party would be prepared to prove at the appropriate stage of the proceedings. A party opposing such a motion is free to elaborate upon the facts in a brief. See, e.g., *Chavez v. Illinois State Police*, 251 F.3d 612, 650 (7th Cir. 2001) (court reviewing dismissal under Rule 12(b)(6) will consider new factual allegations on appeal provided they are consistent with com-

A.  *The Higher Education Act and Regulatory Background*

Congress enacted the Higher Education Act of 1965 (HEA or the Act), now codified as amended at 20 U.S.C. § 1001 *et seq.*, "to keep the college door open to all students of ability, regardless of socioeconomic background." *Rowe v. Educational Credit Management Corp.*, 559 F.3d 1028, 1030 (9th Cir. 2009) (citation and internal quotation marks omitted); see also 20 U.S.C. § 1070(a) (identifying purpose of the statute). Among other things, the Act created the Federal Family Education Loan Program (FFELP), "a system of loan guarantees meant to encourage lenders to loan money to students and their parents on favorable terms." *Chae v. SLM Corp.*, 593 F.3d 936, 938–39 (9th Cir. 2010) (footnote omitted). The Secretary of Education administers the FFELP and has issued regulations to carry out the program.

In general, the FFELP regulates three layers of student loan transactions: (1) between lenders and borrowers, (2) between borrowers and guaranty agencies, and (3) between guaranty agencies and the Department of Education. See *Chae*, 593 F.3d at 939. Under the program, lenders use their own funds to make loans to students attending post-secondary institutions. These loans are guaranteed by guar-

plaint); *American Inter-Fidelity Exchange v. American Re-Insurance Co.*, 17 F.3d 1018, 1022 (7th Cir. 1994) (plaintiff may point to facts consistent with complaint to show ability to prevail); *Early v. Bankers Life & Casualty Co.*, 959 F.2d 75, 79 (7th Cir. 1992) (plaintiff may allege additional facts without evidentiary support to oppose motion to dismiss). There is no reason she may not also add even non-evidentiary materials (such as newspaper articles) to illustrate what she plans to prove, especially in light of the post-*Iqbal* uncertainty about the federal pleading standard of "plausibility."

anty agencies and reinsured by the federal government. See 20 U.S.C. § 1078(a)–(c). Because of the reinsurance commitment, the federal government serves as the ultimate guarantor on each loan.

This lawsuit deals primarily with the second layer of transactions—the relationship between a student borrower who has defaulted for the first time and her guaranty agency. When a borrower defaults on a loan and the lender is unable to recover the amount despite due diligence, the lender notifies the guaranty agency of the default and the guaranty agency purchases the loan from the lender. See *Chae*, 593 F.3d at 939. Once the lender has transferred the debt to the guaranty agency, that agency may recover its losses from the Department of Education. See 20 U.S.C. § 1078(c)(1)(A), (E); 34 C.F.R. § 682.406(a). The guaranty agency must then take numerous steps to collect the defaulted student loan. The regulations at issue here relate to this stage of the process.

To understand these regulations, some background is helpful. In the mid-1980s, Congress grew concerned that federal taxpayers were effectively footing the bill for the costs of collecting defaulted student loans. In 1986 Congress amended the HEA to require guaranty agencies to assess collection costs against borrowers to prevent these costs from being passed on to federal taxpayers. See *Black v. Educational Credit Mgmt. Corp.*, 459 F.3d 796, 799 (7th Cir. 2006). The relevant statutory provision provides simply that "a borrower who has defaulted on a loan … shall be required to pay … reasonable collection costs." 20 U.S.C. § 1091a(b)(1). Congress chose not to define the meaning of "reasonable collection costs" in the statute and instead "left it up to the Secretary [of Education] to interpret that term through regula-

tions." *Black*, 459 F.3d at 799; 20 U.S.C. § 1082(a)(1) (delegating authority to the Secretary of Education to "prescribe such regulations as may be necessary to carry out the purposes" of FFELP).

The regulations define "reasonable collection costs." Two regulations are central to this lawsuit.[2] We describe these regulations in detail below, and we ultimately agree with the interpretation of the Secretary of Education, which is consistent with Bible's. In short, 34 C.F.R. § 682.405 provides that guaranty agencies must create loan rehabilitation programs for all borrowers who have enforceable promissory notes, and 34 C.F.R. § 682.410 establishes fiscal, administrative, and enforcement requirements that a guaranty agency must satisfy to participate in the FFELP. One requirement is that a guaranty agency must give a borrower who has defaulted notice and the opportunity to enter into a repayment agreement before it assesses collection costs or reports the default to a consumer reporting agency. 34 C.F.R. § 682.410(b)(5)(ii)(D). The guaranty agency is not permitted to charge collection costs to the borrower if (1) this is the first time the borrower has defaulted, (2) she enters into a repayment agreement within 60 days of receiving notice that the guaranty agency has paid the default claim, and (3) she

---

[2] The FFELP regulations have been revised several times since 2006, when Bible signed the MPN. Her MPN provides that any amendment to the HEA and its associated regulations "governs the terms of any loans disbursed on or after the effective date of such amendment, and such amended terms are hereby incorporated into this MPN." App. 122. The amended complaint does not specify when disbursements to Bible took place. In the absence of any dispute, and because Bible defaulted in 2012, we apply the regulations that were in effect between July 1, 2010 and June 30, 2014.

complies with that agreement. Imposing collection costs on a borrower under these circumstances would be "unreasonable" within the meaning of 20 U.S.C. § 1091a(b)(1).

B.  *Bible's Loan, Default, and Decision to Enter into the Rehabilitation Agreement*

In June 2006, Bible obtained a student loan. The written agreement governing her loan is the Federal Stafford Loan Master Promissory Note (MPN), which identifies Citibank as the "Lender" and defendant United Student Aid Funds (USA Funds) as the "Guarantor, Program, or Lender." The MPN expressly incorporates the Higher Education Act and its associated regulations into the terms of the contract: "Loans disbursed under this MPN are subject to the annual and aggregate loan limits specified in the Higher Education Act of 1965, as amended, 20 U.S.C. [§] 1070, et seq., and applicable U.S. Department of Education regulations (collectively referred to as the 'Act')."

The contract term covering "late charges and collection costs" states:

> The lender may collect from me: (i) a late charge for each late installment payment if I fail to make any part of a required installment payment within 15 days after it becomes due, and (ii) any other charges and fees *that are permitted by the Act for the collection of my loans*. If I default on any loans, I will pay reasonable collection fees and costs, plus court costs and attorney fees.

(Emphasis added.) The "governing law and notices" term provides: "The terms of this MPN will be interpreted in ac-

cordance with the applicable federal statutes and regulations, and the guarantor's policies. Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this MPN."

In 2012, Citibank determined that Bible was in default and transferred the debt to USA Funds, which paid Citibank's default claim. To comply with its obligations under the HEA and its associated regulations, USA Funds, through its agent General Revenue Corp. (GRC), mailed Bible a form letter dated April 12, 2012 saying that her loan was in default and identifying several options for resolving her debt, including the opportunity for loan rehabilitation. This default letter included a table with the following information:

| | Current Principal | Current Interest | Current Collection Cost Balance | Current Other Charges | Current Interest Rate |
|---|---|---|---|---|---|
| Citibank, N.A. | 6556.64 | 32.94 | 0.00 | 0.00 | 6.800% |
| Citibank, N.A. | 6934.09 | 34.83 | 0.00 | 0.00 | 6.800% |
| Citibank, N.A. | 2186.35 | 11.07 | 0.00 | 0.00 | 6.800% |
| Citibank, N.A. | 2295.07 | 11.61 | 0.00 | 0.00 | 6.800% |

The letter noted that Bible's current total amount due was $18,062.60.

Between April 12 and April 25, Bible and her attorney spoke to GRC on the phone three times to negotiate a loan rehabilitation agreement. Bible and GRC agreed on a rehabilitation plan requiring monthly payments of $50. On April 27, GRC faxed Bible a form rehabilitation agreement. Bible promptly signed the agreement and returned it by fax on April 30, 2012.

The rehabilitation agreement included another table, identical to the one displayed in the default letter except for the current interest column:

|  | Current Principal | Current Interest | Current Collection Cost Balance | Current Other Charges | Current Interest Rate |
|---|---|---|---|---|---|
| Citibank, N.A. | 6556.64 | 51.24 | 0.00 | 0.00 | 6.800% |
| Citibank, N.A. | 6934.09 | 54.18 | 0.00 | 0.00 | 6.800% |
| Citibank, N.A. | 2186.35 | 17.22 | 0.00 | 0.00 | 6.800% |
| Citibank, N.A. | 2295.07 | 18.06 | 0.00 | 0.00 | 6.800% |

The agreement also said that Bible's current total amount due was $18,112.85. Accumulating interest accounted for the $50.25 increase in Bible's total balance. The figures for her

"current collection cost balance" and "current other charges" remained at all times $0.

Five paragraphs above the signature line, toward the end of the rehabilitation agreement, the following language appears:

> Once rehabilitation is complete, collection costs that have been added will be reduced to 18.5% of the unpaid principal and accrued interest outstanding at the time of Loan Rehabilitation. Collection costs may be capitalized at the time of the Loan Rehabilitation by your new lender, along with outstanding accrued interest, to form one new principal amount.

The paragraph immediately above the signature line states: "By signing below, I understand and agree that the lender may capitalize collection costs of 18.5% of the outstanding principal and accrued interest upon rehabilitation of my loan(s)."

After signing the rehabilitation agreement, Bible made nine on-time payments of $50. Although she fully complied with her obligations under this agreement, USA Funds assessed collection costs against her in the amount of $4,547.44. It applied her monthly payments toward the collection costs rather than the principal. When Bible filed this lawsuit, she had not completed the rehabilitation process. (Her loan had not yet been sold to an eligible lender.) She remains current on her loan under the terms of the rehabilitation agreement.

C. *Procedural History*

Bible filed a complaint individually and on behalf of a proposed class of other borrowers who had entered into loan

agreements under the HEA but defaulted, later entered into similar rehabilitation agreements, and were assessed collection costs. She moved to certify the class and then filed an amended complaint alleging breach of contract under Indiana law and a violation of RICO, 18 U.S.C. § 1962(c). USA Funds moved to dismiss. The district court granted the motion to dismiss and entered a final judgment dismissing both claims with prejudice. It also denied as moot Bible's motion for class certification. Bible appeals the district court's decision regarding both claims. After oral argument, we invited the Secretary of Education to file an *amicus* brief addressing his interpretation of the relevant statutory framework and federal regulations. He did so, and the parties have responded to those views.

II. *Analysis*

We conclude that (A) Bible has stated a viable breach of contract claim under Indiana law; (B) federal law does not preclude Bible from pursuing this state-law claim; and (C) Bible has stated a viable RICO claim under federal law, though it remains to be seen whether she can support that claim with evidence of fraudulent intent.

A. *Breach of Contract Claim*

"Under Indiana law, the elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." *U.S. Valves, Inc. v. Dray*, 190 F.3d 811, 814 (7th Cir. 1999), citing *Fowler v. Campbell*, 612 N.E.2d 596, 600 (Ind. App. 1993). The parties agree that the MPN is a valid contract and that it governs the terms of Bible's loan, including the consequences of her default. They disagree,

however, about whether the amended complaint has adequately pled a breach of the MPN and resulting damages.[3]

    1.  *Breach*

        a.  *Incorporation by Reference*

Bible alleges that USA Funds breached the MPN by assessing collection costs even though she timely entered into a repayment agreement and complied with her obligations under that agreement. She argues that the MPN incorporated federal regulations that prohibit guaranty agencies from imposing collection costs against first-time defaulters who promptly agree to repay their loans within 60 days of receiving notice from the guaranty agency that it has paid the lender's default claim and who have complied with that agreement. She relies on 34 C.F.R. §§ 682.405 and 682.410 and language in the MPN to the effect that the guaranty agency can collect from the borrower only "charges and fees that are permitted by the Act."

We agree with Bible that the MPN incorporated the HEA and its associated regulations. "Other writings, or matters contained therein, which are referred to in a written contract may be regarded as incorporated by the reference as a part of the contract and, therefore, may properly be considered in the construction of the contract." *I.C.C. Protective Coatings, Inc. v. A.E. Staley Mfg. Co.*, 695 N.E.2d 1030, 1036 (Ind. App. 1998); see also, e.g., *Jones v. City of Logansport*, 436 N.E.2d 1138, 1148 (Ind. App. 1982) (contract incorporated federal

---

[3] USA Funds argues that the rehabilitation agreement is not a valid contract because it was not supported by consideration. We do not reach this issue because Bible's breach of contract claim alleges a breach of the MPN, not the rehabilitation agreement.

occupational safety and health regulations). The page of the contract that sets out the terms of the loan refers to the HEA and its regulations no fewer than 16 times, though once would be enough. In addition to the more general governing law provision, which provides that the terms of the contract "will be interpreted in accordance with the applicable federal statutes and regulations," the specific term covering "late charges and collection costs" states that "[t]he lender may collect from me … any other charges and fees that are permitted by the Act." And the contract defines "the Act" as the HEA "and applicable U.S. Department of Education regulations."

USA Funds relies on a sentence in the MPN granting it the right to impose "reasonable collection fees and costs, plus court costs and attorney fees." USA Funds reads this language in isolation to mean that it can impose collection costs at any time after the borrower has defaulted. This interpretation fails to give weight to the preceding sentence, which limits the lender's power to impose only those charges and fees "that are permitted by the Act." Basic principles of contract law require a court to consider a contract's provisions together and in a way that harmonizes them. E.g., *Hinc v. Lime–O–Sol Co.*, 382 F.3d 716, 720 (7th Cir. 2004) (Indiana law). If USA Funds charged Bible collection costs in violation of the HEA and its regulations, then it breached the contract.

b.  *Requirements for Imposing Collection Costs*

Bible has plausibly alleged a breach of the MPN by alleging that USA Funds assessed collection costs that were not authorized by the Higher Education Act and its regulations. This conclusion is supported by two independent grounds. The author of this opinion agrees with the Secretary of Edu-

cation and Bible that under the best interpretation of the statutes and regulations, the collection costs assessed here were prohibited. Cf. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. —, 135 S. Ct. 1199, 1208 n.4 (2015) ("Even in cases where an agency's interpretation receives *Auer* deference, however, it is the court that ultimately decides whether a given regulation means what the agency says.").

Second, this author and Judge Flaum agree that even if this were not the best interpretation of the statutes and accompanying regulations, it is at least a reasonable one, and we defer to that interpretation because it reflects the reasoned position of the Secretary of Education, who is tasked with administering the program. See *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984); *Auer v. Robbins*, 519 U.S. 452, 461 (1997).

### i.   *The Statutory and Regulatory Requirements*

Beginning with interpretation without deference to the agency, Bible acknowledges that guaranty agencies are required to impose collection costs on borrowers who have defaulted in certain circumstances. Both the HEA itself and the implementing regulations make this clear. See 20 U.S.C. § 1091a(b)(1) ("[A] borrower who has defaulted on a loan … shall be required to pay … reasonable collection costs."); *id.* § 1078-6(a)(1)(D)(i)(II)(aa) (upon successful rehabilitation, a guaranty agency may, in order to defray collection costs, "charge to the borrower an amount not to exceed 18.5 percent of the outstanding principal and interest at the time of the loan sale"); 34 C.F.R. § 682.410(b)(2) ("[T]he guaranty agency shall charge a borrower an amount equal to reasona-

ble costs incurred by the agency in collecting a loan.").[4] Bible argues, however, that the regulations prohibit USA Funds from imposing collection costs in her circumstances: a first-time defaulter who she promptly agreed to enter into a re-habilitation agreement within 60 days of receiving notice that USA Funds had paid her lender's default claim, and who has complied with that agreement. She contends that imposing collection costs in these circumstances is "unrea-sonable" under 20 U.S.C. § 1091a(b)(1).

Two key regulations define the phrase "reasonable collec-tion costs" in § 1091a(b)(1). The first regulation, 34 C.F.R. § 682.405, requires guaranty agencies to create loan rehabili-tation programs for all borrowers that have enforceable promissory notes. These programs are designed to give eli-gible borrowers an opportunity to rehabilitate defaulted loans so that, upon successful rehabilitation, the loans may be purchased by eligible lenders and removed from default status. 34 C.F.R. § 682.405(a).[5]

A loan is considered rehabilitated only after two re-quirements are met: (1) the borrower has timely made nine out of ten payments required under a monthly repayment agreement, and (2) the loan has been sold to an eligible lend-er. 34 C.F.R. § 682.405(a)(2)(i)–(ii). Subsection (b) of this regu-lation then establishes specific requirements for terms that

---

[4] Again, this opinion cites and quotes the versions of the statutes and regulations applicable to Bible's loan. For example, the 18.5% cap on col-lection costs has since been reduced to 16%.

[5] Some loans, such as loans for which a judgment has already been obtained, are exempted from this provision. See 34 C.F.R. § 682.405(a)(1). None of these exemptions is relevant here.

must be included in the rehabilitation agreement. For example, the guaranty agency must provide the borrower with a written statement confirming the borrower's "reasonable and affordable payment amount" and "inform[ing] the borrower of the amount of the collection costs to be added to the unpaid principal at the time of the sale." 34 C.F.R. § 682.405(b)(1)(vi).

The second regulation, 34 C.F.R. § 682.410, is even more specific. It establishes fiscal, administrative, and enforcement requirements that a guaranty agency must satisfy to participate in the FFELP. Paragraph (b)(2) addresses collection costs:

> Collection charges. Whether or not provided for in the borrower's promissory note and subject to any limitation on the amount of those costs in that note, the guaranty agency shall charge a borrower an amount equal to reasonable costs incurred by the agency in collecting a loan on which the agency has paid a default or bankruptcy claim. These costs may include, but are not limited to, all attorney's fees, collection agency charges, and court costs. [Subject to certain exceptions not relevant here], the amount charged a borrower must equal the lesser of—
>
> > (i)   The amount the same borrower would be charged for the cost of collection under the formula in 34 C.F.R. [§] 30.60; or

> (ii) The amount the same borrower would be charged for the cost of collection if the loan was held by the U.S. Department of Education.

34 C.F.R. § 682.410(b)(2). This paragraph makes clear that guaranty agencies must charge a borrower reasonable collection costs, and it establishes a cap on the maximum *amount* that can be charged by the guaranty agency. Paragraph (b)(2), however, does not specify the *circumstances* under which these costs may be assessed. That issue is addressed by other portions of § 682.410, which create procedural safeguards for student borrowers.

First, some context. Guaranty agencies have two primary ways of pushing student-borrowers to repay their defaulted loans: (1) reporting the delinquent account to a consumer reporting agency (which lowers the borrower's credit rating) and (2) assessing collection costs against the borrower. Because the Department of Education was concerned about recent graduates facing these adverse consequences without first being given an opportunity to cure their defaults, it created protections in § 682.410(b)(5)(ii). It provides that guaranty agencies must take certain actions before either reporting the default or assessing collection costs:

> The guaranty agency, after it pays a default claim on a loan *but before it reports the default to a consumer reporting agency or assesses collection costs against a borrower*, shall, within the timeframe specified in paragraph (b)(6)(ii) of this section, provide the borrower with—

> (A) Written notice that meets the requirements of paragraph (b)(5)(vi) of this section regarding the proposed actions;
>
> (B) An opportunity to inspect and copy agency records pertaining to the loan obligation;
>
> (C) An opportunity for an administrative review of the legal enforceability or past-due status of the loan obligation; and
>
> (D) An opportunity to enter into a repayment agreement on terms satisfactory to the agency.

34 C.F.R. § 682.410(b)(5)(ii) (emphasis added).

This provision does not specify a particular timeframe for these actions, but it includes two cross-references that do. First, subparagraph (b)(6)(ii) requires the guaranty agency to send the written notice mentioned in (b)(5)(ii) within 45 days of the date it pays the lender's default claim. Second, subparagraph (b)(5)(iv)(B) requires the agency to give the borrower at least 60 days from the date of the initial notice to request administrative review of the loan.

Subparagraph (b)(5)(ii) effectively creates a safe harbor for borrowers who find themselves in default for the first time. When a borrower is first notified that a guaranty agency has paid a default claim on her loan, she has a 60-day window to request administrative review of the debt or to enter into a repayment agreement with the agency. If she does not take either action, the guaranty agency can then

take collection actions against her, report her default to a consumer reporting agency, and assess collection costs against her in the amount specified by § 682.410(b)(2).

To be sure, subparagraph (b)(5)(iv)(B) mentions the opportunity to request administrative review of the loan obligation, not the opportunity to enter into a repayment agreement with the agency. But that is not a problem for Bible. Her point is that subparagraph (b)(5)(ii) requires the guaranty agency to provide the borrower with all four things before reporting the debt to a consumer reporting agency or assessing collection costs, and one of those things (administrative review) triggers a waiting period of at least 60 days. The regulations do not force the borrower to choose between requesting administrative review and entering into a repayment program. The borrower has a right to request administrative review and then to decide whether to enter into a repayment agreement. Accordingly, the borrower has at least 60 days to enter into an alternative repayment agreement. That Bible did not request administrative review of her loan obligation in this case is beside the point; she had at least 60 days to do so, and before that time ran out, she entered into the rehabilitation agreement.

This understanding is confirmed by § 682.410(b)(6)(ii), which requires the guaranty agency to inform the borrower "that if he or she does not make repayment arrangements acceptable to the agency, the agency will promptly initiate procedures to collect the debt," such as garnishing her wages, filing a civil suit, or taking her income tax refunds. 34 C.F.R. § 682.410(b)(6)(ii). What would be the point of warning the borrower that declining to make repayment arrangements would trigger costly debt collection activities if

the guaranty agency could initiate these procedures and assess those costs regardless of whether she agrees to repay?

That the regulations create this sort of safe harbor is not surprising. Under USA Funds' interpretation of the regulations, a guaranty agency could assess collection costs against a borrower even though it was *never* forced to "initiate procedures to collect the debt." This would allow the guaranty agency to charge for costly actions that it might never need to take, such as wage garnishment or filing a civil suit. This case illustrates the point. USA Funds assessed over $4,500 in collection costs even though it merely sent one letter, sent and received one fax, spoke to Bible and her attorney on the phone several times, and cashed Bible's monthly checks.

The safe harbor of subparagraph (b)(5)(ii) also creates an incentive for first-time defaulters to rehabilitate their loans by voluntary repayment. If first-time defaulters knew that they would face collection costs regardless of whether they agree to repay, they would have less incentive to enter into the repayment program voluntarily. These regulations are designed to reward cooperation.

This concept of providing a borrower with notice and an opportunity to resolve the default before being subject to adverse consequences, such as credit reporting or collection costs, is not new. When the Department first incorporated this concept into the FFELP regulations in 1992, it was actually borrowing from a requirement that had been imposed on guaranty agencies back in 1986 under the federal tax refund offset program. Under that program, guaranty agencies were required to provide borrowers with notice of the proposed offset and an opportunity to avoid that offset by entering into a satisfactory repayment agreement. See Letter from

Lynn B. Mahaffie, Dep't of Education, Dear Colleague Letter Gen-15-14, at 2–3 (July 10, 2015). The disputed regulations here are based on that same model: the defaulted borrower must be given an opportunity to avoid the adverse consequences by promptly agreeing to repay the debt voluntarily.

The intent to create this safe harbor is further shown by a related statutory provision dealing with credit reporting. Under the HEA, Congress expressly provided that before reporting the default to a consumer reporting agency, the guaranty agency must provide the borrower with notice that the loan will be reported as in default "*unless* the borrower enters into repayment." 20 U.S.C. § 1080a(c)(4) (emphasis added). "[I]f the borrower has not entered into repayment within a reasonable period of time," *then* the guaranty agency must report the default. *Id.* The clear implication of § 1080a(c)(4) is that if the borrower timely enters into repayment, then the guaranty agency may *not* report the loan as in default.

The Secretary of Education issued the disputed regulation here, 34 C.F.R. § 682.410(b)(5), to implement this statutory requirement found in § 1080a(c)(4). See Letter from Lynn B. Mahaffie, Dep't of Education, Dear Colleague Letter Gen-15-14, at 2 (July 10, 2015), citing 57 Fed. Reg. 60280, 60355–56 (Dec. 18, 1992). Subparagraph (b)(5)(ii) discusses credit reporting and the assessment of collection costs in the exact same way: "but before it reports the default to a consumer reporting agency or assesses collection costs against a borrower … ." USA Funds has given us no persuasive reason to treat one of the stated adverse consequences of default (a bad credit report) differently from the other (collection

costs). Yet that is precisely what its interpretation of the statutory framework and related regulations would do.

This conclusion is based on the text of the applicable statutory provisions, regulations, and the MPN itself. USA Funds does not squarely address the textual basis of Bible's claim but responds with three arguments. First, it argues that § 682.410(b)(2) allows it to impose collection costs, and the regulations do not explicitly prohibit the imposition of collection costs against a borrower who has defaulted but promptly entered into a repayment agreement. This argument is not persuasive. Paragraph (b)(2) merely establishes the background rule that the guaranty agency must assess "reasonable collection costs" against the borrower and establishes the cap on the maximum amount of costs that can be charged. It does not say anything about the circumstances under which these costs can be imposed. As explained, other parts of the regulation such as subparagraph (b)(5)(ii) impose more specific requirements about the circumstances in which collection costs may be assessed.

Second, USA Funds contends that Bible's interpretation of § 682.410(b)(5)(ii)(D) ignores the fact that the repayment agreement must be "on terms satisfactory to the agency." It appears to argue that under this language the guaranty agency retains the discretion to assess collection costs whenever it wants. But this interpretation is inconsistent with the introductory paragraph of the regulation, which makes clear that the agency must provide the borrower an opportunity to enter into a repayment agreement *before* collection costs are assessed. Guaranty agencies do not have unfettered dis-

cretion to impose whatever collection costs they want, whenever they want, as the argument suggests.[6]

Contrary to USA Funds' arguments, Bible's interpretation still gives meaning to the phrase "on terms satisfactory to the agency." Under her theory, USA Funds retained the discretion to set the terms of the repayment agreement. After all, it transmitted the form document to Bible that became the rehabilitation agreement. It could have insisted on higher monthly payments, for example. USA Funds had the power to set the initial terms of its offer and to reject any proposed counteroffer. It did not have the power, though, to impose collection costs in contravention of § 682.410(b)(5)(ii).

Third, USA Funds points to another provision in the MPN: "If I default, the guarantor may purchase my loans and capitalize all then-outstanding interest into a new principal balance, and collection fees will become immediately due and payable." This provision, however, does not displace the guaranty agency's obligations under 34 C.F.R. § 682.410. The collection fees become "immediately due and payable" only after the guaranty agency has first provided the borrower with (1) written notice that meets the require-

---

[6] A "rehabilitation" agreement is one type of authorized "repayment agreement." See 34 C.F.R. § 682.405(a)(2) (a loan is "rehabilitated" after the borrower has voluntarily "made and the guaranty agency has received nine of the ten payments required under a *monthly repayment agreement*") (emphasis added); see also 20 U.S.C. § 1078-6(a)(4) (provision authorizing loan rehabilitation refers to borrower making "scheduled repayments"); accord, Letter from Lynn B. Mahaffie, Dep't of Education, Dear Colleague Letter Gen-15-14, at 5 (July 10, 2015) ("Thus, a rehabilitation agreement is simply a specific form of a satisfactory repayment agreement.").

ments spelled out in subparagraph (b)(5)(vi), (2) an opportunity to inspect and copy agency records pertaining to the loan obligation, (3) an opportunity for administrative review of the enforceability or past-due status of the loan obligation, and (4) an opportunity to enter into a repayment agreement. See 34 C.F.R. § 682.410(b)(5)(ii)(A)–(D). Interpreting the provision as USA Funds suggests would contradict § 682.410(b)(5)(ii). Recall, moreover, that USA Funds had told Bible that she owed zero collection costs when she first defaulted. It was not until after she signed the rehabilitation agreement that she finally learned about the costs.

ii. *Deference to the Secretary of Education's Interpretation*

Even if the preceding analysis does not provide the best interpretation of the statutory framework and accompanying regulations, the author and Judge Flaum agree the same result would still be correct based on the deference we owe to the Secretary of Education, who is tasked with administering the FFELP and issuing the implementing regulations.

Because the HEA does not define "reasonable collection costs," Congress "explicitly left a gap for the agency to fill," *Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837, 843 (1984), and delegated to the Secretary of Education authority to "prescribe such regulations as may be necessary to carry out the [Act's] purposes." 20 U.S.C. § 1082(a)(1). The Secretary exercised that expressly delegated authority by issuing 34 C.F.R. § 682.410, "which establishes the basic rules for the assessment of collection costs against borrowers who have defaulted on their student loans." See *Black v. Educational Credit Mgmt. Corp.*, 459 F.3d 796, 800 (7th Cir. 2006). The Secretary's reasonable interpretation of the

Act is entitled to substantial deference. See *Chevron*, 467 U.S. at 843–44. And the agency's interpretation of its own regulations is "controlling" unless it is (1) plainly erroneous or inconsistent with the regulation, (2) does not reflect the agency's fair and considered judgment on the matter in question, or (3) represents a *post hoc* rationalization advanced by the agency seeking to defend past agency action against attack. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. —, 132 S. Ct. 2156, 2166 (2012), citing *Auer v. Robbins*, 519 U.S. 452, 461–62 (1997) (some citations omitted).

The Secretary's interpretation of "reasonable collection costs" in 20 U.S.C. § 1091a(b)(1) is reasonable. The Secretary interprets "reasonable" to mean that similar costs must be assessed against borrowers who are at similar stages of delinquency. Under the Secretary's view, a borrower who promptly enters into a voluntary repayment agreement and complies with that agreement, thereby obviating the need for the guarantor to initiate costly debt collection procedures, is not similarly situated to someone who does not, thereby forcing the guarantor to undertake costly debt collection procedures.

Even if we thought the interpretation urged by USA Funds were better in the abstract, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron*, 467 U.S. at 844 (footnote omitted); see also *Michigan v. EPA*, 576 U.S. —, 135 S. Ct. 2699, 2707 (2015) ("*Chevron* directs courts to accept an agency's reasonable resolution of an ambiguity in a statute that the agency administers."); *Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.*, 470 U.S. 116, 125 (1985) ("This view of the agen-

cy charged with administering the statute is entitled to considerable deference; and to sustain it, we need not find that it is the only permissible construction that EPA might have adopted but only that EPA's understanding of this very 'complex statute' is a sufficiently rational one to preclude a court from substituting its judgment for that of EPA.").

USA Funds has not shown that the Secretary's interpretation is unworthy of deference. The Secretary's decision to interpret 34 C.F.R. § 682.410(b)(5)(ii) as creating a safe harbor for borrowers in Bible's position is not plainly erroneous or inconsistent with the regulation. It reflects the agency's fair and considered judgment on the question. And it does not represent a *post hoc* rationalization by the agency seeking to defend past agency action against attack. There is no indication from the record that the Secretary has ever taken a contrary position since the regulation was first adopted in 1992. And as explained above, when the Department of Education first issued this regulation, it was merely borrowing from a requirement that had previously been imposed on guaranty agencies under the federal tax refund offset program. See Letter from Lynn B. Mahaffie, Dep't of Education, Dear Colleague Letter Gen-15-14, at 2–3 (July 10, 2015) (explaining history of the "notice and opportunity to resolve" concept).

In addition, the Secretary took this same position in a legal brief filed in an earlier case in this circuit, *Educational Credit Mgmt. Corp. v. Barnes*, 318 B.R. 482 (S.D. Ind. 2004), *aff'd sub nom. Black v. Educational Credit Mgmt. Corp.*, 459 F.3d 796 (7th Cir. 2006), interpreting § 682.410(b)(5) in the same manner it does here. Both its reasoning and its conclusion

have remained exactly the same.[7] Cf. *Christopher*, 132 S. Ct. at 2165–68 (no *Auer* deference where agency's interpretation would have imposed "massive liability" for conduct that occurred before the announcement of the interpretation, agency's announcement was preceded by long period of acquiescence to industry practice, and agency materially changed its reasoning during course of litigation).

To summarize, Bible has alleged sufficiently that USA Funds breached its contract with her by assessing over $4,500 in collections costs after she timely entered into and complied with a monthly repayment agreement, in violation of the applicable regulations that were incorporated into the parties' contract.

### 2. *Damages*

We next address whether Bible has adequately pled damages. USA Funds argues she has not because she defaulted on her loan and continues to owe money on that obligation. This argument is meritless. Of course Bible continues to owe money under her loan obligation. That does not mean she has not been damaged by USA Funds' imposing over $4,500 in unauthorized collection costs. These costs represent new charges that have been added to her accrued interest and principal, thereby increasing the total amount she

---

[7] See App. 54–55 ("Department rules require the guarantor who acquires a loan by reason of the default of the borrower … to charge collection costs *only after* providing the debtor an opportunity to contest the debt and to enter into a repayment arrangement for the debt. … The regulations therefore direct guarantors to charge collection costs *only* to those debtors who cause the guarantor to incur collection costs by failing to agree promptly to repay voluntarily. … *Only* those defaulters who ignore this opportunity face collection cost charges.") (emphases added).

owes on her account. Because these charges were not permitted by her contract, she has plausibly alleged damages, even if the remedy might take the form of a credit to her account rather than cash in her pocket. Bible has plausibly alleged a viable breach of contract claim under state law.

B.  *Preemption & the "Disguised Claim" Theory*

We next examine whether federal law preempts or otherwise displaces Bible's state law claim. "Preemption can take on three different forms: express preemption, field preemption, and conflict preemption." *Aux Sable Liquid Products v. Murphy*, 526 F.3d 1028, 1033 (7th Cir. 2008). USA Funds relies on conflict preemption. It also argues that the breach of contract claim is nothing more than a "disguised claim" for a violation of the Higher Education Act and is thus "preempted" by the HEA. Neither theory has merit. Federal law does not preempt or otherwise displace Bible's breach of contract claim.

1.  *Conflict Preemption*

Conflict preemption can occur in two situations: (1) when "it is impossible for a private party to comply with both state and federal requirements," or (2) when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (citations and internal quotation marks omitted). USA Funds does not contend that it would be impossible, without violating federal law, for it to comply with the state law duty Bible's suit seeks to impose. Instead, it invokes the second species of conflict preemption known as "obstacle" preemption. USA Funds argues that entertaining Bible's breach of contract claim would frustrate

Congress's goal of "uniformity" because it would require many state and federal courts to interpret HEA regulations in potentially inconsistent ways. We reject this contention.

This argument proves far too much. Under this theory, conflict preemption would occur any time a court would be required to interpret a regulation to decide a case arising under the common law or other sources of law independent of the regulation itself. But courts interpret federal regulations all the time without triggering preemption concerns. The mere possibility that a court would need to interpret a regulation does not itself establish preemption. See *CSX Transportation, Inc. v. Eastwood*, 507 U.S. 658, 664 (1993) ("To prevail on the claim that the regulations have pre-emptive effect, petitioner must establish more than that they 'touch upon' or 'relate to' that subject matter … ."), citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84 (1992); *English v. General Electric Co.*, 496 U.S. 72, 87 (1990) ("Ordinarily, the mere existence of a federal regulatory or enforcement scheme, even one as detailed as § 210 [of the Energy Reorganization Act of 1974], does not by itself imply pre-emption of state remedies."); *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 717 (1985) ("To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive."); *Keams v. Tempe Technical Institute, Inc.*, 39 F.3d 222, 226–27 (9th Cir. 1994) (holding that detailed regulatory scheme under the HEA did not imply preemption of state tort remedies against accreditors). That is the very point of 34 C.F.R. § 682.410(b)(8), which provides that paragraphs (b)(2), (5), and (6)—the provisions at issue here—preempt only "State law … that would *conflict with or hinder satisfac-*

*tion* of the requirements of these provisions." (Emphasis added.)

The real question is whether entertaining Bible's breach of contract claim actually conflicts with the HEA and its associated regulations. It does not. We begin with *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012), where we dealt with a nearly identical issue in the context of the federal Home Affordable Mortgage Program (HAMP). In *Wigod*, the plaintiff brought state law claims against her mortgage service provider, including a breach of contract claim alleging that the defendant breached a written agreement that incorporated the HAMP requirements. Like USA Funds in this case, the defendant in *Wigod* argued that the state law claims were preempted by the federal guidelines under principles of conflict preemption. We rejected the argument. 673 F.3d at 577–81.

Although *Wigod* dealt with a different regulatory framework, its reasoning applies directly here. Bible's claim is that USA Funds breached the MPN by acting contrary to the federal regulations incorporated into the contract. Just as in *Wigod*, "the state-law duty allegedly breached is imported from and delimited by federal standards." *Wigod*, 673 F.3d at 579. In this situation, federal law simply provides the standard of compliance, and the parties' duties are actually enforced under state law. See *id.* at 579–80. There is no conflict.

The Fourth Circuit reached the same conclusion regarding the HEA in *College Loan Corp. v. SLM Corp.*, 396 F.3d 588 (4th Cir. 2005). In that case, the plaintiff sued Sallie Mae and its affiliates under state law, alleging that they had a contract that incorporated the requirements of the HEA and its regulations. The district court held that the state law claims were

preempted. The Fourth Circuit reversed. The court held that the plaintiff's state law claims were not preempted even though they relied on establishing a violation of the HEA and its regulations:

> This point is particularly obvious in relation to [plaintiff's] contract claim. As parties to the Agreement, [the parties] voluntarily included federal standards (the HEA) in their bargained-for private contractual arrangement. Both *expressly agreed* to comply with the HEA. In that context, [defendants'] argument that enforcement of the Agreement's terms is preempted by the HEA boils down to a contention that it was free to enter into a contract that invoked a federal standard as the indicator of compliance, then to proceed to breach its duties thereunder and to shield its breach by pleading preemption. In this case at least, federal supremacy does not mandate such a result.

*Id.* at 598 (citations omitted). The Fourth Circuit's reasoning applies with equal force here.

Unable to distinguish *Wigod* or *College Loan Corp.* in meaningful ways, USA Funds seeks help from *Chae v. SLM Corp.*, 593 F.3d 936 (9th Cir. 2010). But *Chae* actually reinforces our conclusion. There, borrowers sued Sallie Mae under state law for its handling of their student loans. Applying principles of conflict preemption, the Ninth Circuit held that the claims were preempted by the HEA because "[p]ermitting varying state law challenges across the country, with state law standards that may differ and impede uniformity" would pose an obstacle to Congress's purpose in

creating the FFELP. *Chae*, 593 F.3d at 945. The Ninth Circuit, however, carefully distinguished *College Loan Corp.* on grounds directly applicable here, saying that the plaintiff in *College Loan Corp.* had "sought to enforce FFELP rules, not to vary them." *Id.* at 946, citing 396 F.3d at 591–94. In *Chae*, though, the plaintiffs were "not seek[ing] to buttress the FFELP framework, but rather to alter it in their home state." *Id.* They were asking the court to impose a *higher* standard of compliance than was required by federal law. Such claims are preempted, held *Chae*, but that reasoning does not apply here.

Like the plaintiff in *College Loan Corp.* and unlike those in *Chae*, Bible is not attempting to require more of the defendant than was already required by the HEA and its regulations. She seeks only to enforce the federal standards that the parties agreed to in their contract. This case is therefore not different from *Wigod*, where we held that state law claims attempting to enforce the requirements of the HAMP guidelines were not preempted by federal law. In *Wigod*, *College Loan Corp.*, and now this case, the plaintiffs' state law claims were complementary to, not in conflict with, the federal requirements. Bible's claim is not preempted by federal law.

### 2. *The "Disguised Claim" Theory*

In addition to its formal preemption argument, USA Funds argues that Bible's state law claim is "preempted" because it is nothing more than a "disguised claim" for a violation of the HEA, and the HEA does not provide a private right of action. We considered and rejected this same theory in *Wigod*. There the defendant-lender referred to it as an "end-run" theory rather than a "disguised claim" theory. The difference is merely semantic. The defense theory in

both cases is that the lack of a private right of action under a regulatory statute necessarily preempts or otherwise displaces a state law cause of action that makes the violation of that regulatory statute an element of the claim. This theory is mistaken at its core: "The absence of a private right of action from a federal statute provides no reason to dismiss a claim under a state law just because it refers to or incorporates some element of the federal law. To find otherwise would require adopting the novel presumption that where Congress provides no remedy under federal law, state law may not afford one in its stead." *Wigod*, 673 F.3d at 581 (citation omitted).

USA Funds attempts to distinguish *Wigod* on two grounds. First, it says there was no administrative enforcement scheme under the HAMP. That is simply not true as a matter of fact. See *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 773–74 (4th Cir. 2013) (describing administrative enforcement scheme under HAMP); *Wigod*, 673 F.3d at 556–57 (same).

Second, USA Funds contends that *Wigod* is distinguishable because there the Secretary of the Treasury had issued a directive saying that the HAMP must be implemented in compliance with state common law and statutes. See *Wigod*, 673 F.3d at 580. This does not distinguish *Wigod* either. We noted that the directive was additional evidence that federal law did not preempt state law. See *id.* (noting that Department of Treasury's "tacit view of its program's lack of preemptive force" was entitled to "some weight"). We did not suggest that our rejection of the end-run theory depended on this supplemental directive. (In fact, we discussed the supplemental directive in a different section in the opinion.)

If anything, there is even less reason to find preemption in this case because USA Funds voluntarily agreed to comply with the only federal requirements that Bible is attempting to enforce. In *Wigod*, by contrast, the plaintiff had brought claims against the defendant under state tort law in addition to her breach of contract claim.

We reiterate the lesson from *Wigod*. The absence of a private right of action under federal law provides no reason to dismiss a state law claim just because the claim refers to or incorporates some element of the federal law. Congress's decision not to supply a remedy under federal law does not necessarily mean that it also intended to displace state law remedies. The lack of a private right of action under the HEA itself does not preclude Bible's breach of contract claim.

C.  *RICO Claim*

We now turn to Bible's civil RICO claim alleging a violation of 18 U.S.C. § 1962(c). Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). A civil remedy is available under 18 U.S.C. § 1964. To establish a violation of § 1962(c), Bible must eventually prove four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. E.g., *Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466, 472 (7th Cir. 2007). USA Funds contends that Bible has failed to allege plausibly the existence of an enterprise, racketeering activity, or a pattern. Whether or not detailed allegations of each element (other than the alleged fraud) are required at the pleading

stage, cf. *Johnson v. City of Shelby*, 574 U.S. —, 135 S. Ct. 346, 347 (2014) (per curiam) (reversing dismissal for failure to invoke proper statute in complaint); *Runnion v. Girl Scouts of Greater Chicago*, 786 F.3d 510, 517–18, 528 (7th Cir. 2015) (reversing dismissal of complaint), we find that Bible's allegations are sufficient. It remains to be seen whether she can marshal evidence to support her claim, but that's a matter for further proceedings in the district court.

### 1. *Enterprise*

RICO defines the term "enterprise" broadly to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact does not require any structural features beyond "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purposes." *Boyle v. United States*, 556 U.S. 938, 946 (2009). But the definition does require that the defendant be a "person" that is distinct from the RICO enterprise. *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853–54 (7th Cir. 2013) (citations omitted). Under § 1962(c), the plaintiff must also establish that the defendant "person" participated in the operation or management of the distinct enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

Bible identifies USA Funds as the defendant "person" for purposes of RICO, and she defines the "enterprise" as an association-in-fact consisting of USA Funds, GRC, and Sallie Mae. She alleges that the members of the enterprise associated for the common purpose of maximizing revenue before,

during, and after the loan rehabilitation process by unlawfully imposing collection costs on borrowers who had defaulted. USA Funds uses GRC as its debt collector, and Sallie Mae is the parent company of GRC. Although Sallie Mae and USA Funds are "technically independent," Sallie Mae has purchased a number of USA Funds' departments and exerts "extensive financial and operational control" over USA Funds. Am. Compl. ¶ 95.

Our cases have distinguished between two situations: a run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest, versus a truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest. See *United Food & Commercial Workers*, 719 F.3d at 855 ("This type of interaction, however, shows only that the defendants had a commercial relationship, not that they had joined together to create a distinct entity for purposes of improperly filling … prescriptions."); *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 400 (7th Cir. 2009) (distinguishing "garden-variety marketing arrangement" comprised of distinct entities from RICO enterprise). This distinction is important. Without it, "every conspiracy to commit fraud that requires more than one person to commit is a RICO organization and consequently every fraud that requires more than one person to commit is a RICO violation." *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676 (7th Cir. 2000), quoting *Bachman v. Bear, Stearns & Co.*, 178 F.3d 930, 932 (7th Cir. 1999) (footnote and internal quotation marks omitted).

Mindful of this distinction, we conclude that Bible has pled more than a run-of-the-mill commercial relationship. Bible alleges a number of facts permitting the reasonable in-

ference that, with respect to managing accounts before, during, and after the loan rehabilitation process, USA Funds, GRC, and Sallie Mae work as a single enterprise.

First, she alleges an unusual degree of economic interdependence among the entities. According to the amended complaint, USA Funds agreed to place all defaulted loans with Sallie Mae for portfolio management. Sallie Mae was then authorized to refer a large number of the defaulted loans to its "affiliates" or subsidiary debt collectors such as GRC. In addition, USA Funds committed to sell at least half of its rehabilitated loans to Sallie Mae. Under this arrangement, USA Funds not only paid Sallie Mae directly to manage its portfolio but also compensated Sallie Mae indirectly by using its affiliates and subsidiaries for debt collection and by agreeing to sell a large chunk of rehabilitated loans to Sallie Mae.

Second, Bible alleges that the entities do not operate as completely separate entities in managing the loan rehabilitation process. For example, she alleges that: the printout on top of the rehabilitation agreement indicates that it was sent from a Sallie Mae fax machine; in answers to interrogatories in another lawsuit, GRC identified five Sallie Mae officials who had approved and provided input into the wording of GRC's collection correspondence, including the correspondence at issue in this case; Sallie Mae assumes responsibility for compliance with some of USA Funds' statutory duties, including the delivery of privacy policies to borrowers; Sallie Mae has agreed to a marketing plan under which Sallie Mae will promote USA Funds as a guaranty agency; Sallie Mae has agreed not to use another guaranty agency unless, despite Sallie Mae's best efforts, a school or lender insists; asso-

ciate counsel at Sallie Mae recently appeared at a settlement conference in a Fair Debt Collection Practices Act lawsuit against GRC purporting to have settlement authority on behalf of GRC; and in another FDCPA lawsuit, GRC negotiated a settlement release that covered Sallie Mae and other entities "related to" Sallie Mae, including USA Funds, despite the fact that neither Sallie Mae nor USA Funds were named as defendants in the case.

These allegations distinguish this case from cases like *United Food & Commercial Workers*, 719 F.3d at 854–55 (noting that complaint failed to allege "that officials from either company involved themselves in the affairs of the other"), and *Crichton*, 576 F.3d at 400 (noting that plaintiff's claim "begins and ends" with the fraud allegedly committed by individual entity, not enterprise). Taken together, Bible's allegations indicate a common purpose, relationships among the three entities associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purposes. See, e.g., *Sykes v. Mel Harris & Associates, LLC*, 757 F. Supp. 2d 413, 426–27 (S.D.N.Y. 2010) (complaint plausibly alleged RICO enterprise comprised of debt-buying company, debt collection agency, process service company, and others).

USA Funds contends that even if there is an enterprise, USA Funds' own alleged actions could not amount to participation in the operation or management of the enterprise's affairs because USA Funds did not operate or manage the collection efforts related to Bible's defaulted loans. We disagree. Bible alleges that USA Funds "directed GRC to unlawfully and fraudulently impose collection costs [on] borrowers," Am. Compl. ¶ 88, and that "GRC carried out these in-

structions." *Id.*, ¶ 89. She also alleges that GRC secured a release for USA Funds and Sallie Mae in the FDCPA case mentioned above because "both [USA Funds] and Sallie Mae were intimately involved in GRC's debt collection activities." *Id.* ¶ 105.

USA Funds points out that merely performing a service for another entity is not sufficient to establish this element. That is correct as far as it goes. See *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998) ("Indeed, simply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO liability under § 1962(c); instead, the individual must have participated in the operation and management of the enterprise itself."). But that principle does not help USA Funds. If we were to apply it here, it might mean that GRC did not participate in the operation or management of the enterprise's affairs since GRC was hired by USA Funds to perform the debt collection activities. But the same cannot be said for USA Funds, which hired GRC, directed it to impose the collection costs at issue, and was "intimately involved" in GRC's debt collection activities more generally. Bible's amended complaint pleads factual content permitting the reasonable inference that USA Funds, in conjunction with Sallie Mae, actually directed the enterprise's debt collection activities even though GRC was the entity that dealt with the borrower most directly. She has plausibly alleged that USA Funds conducted or participated in the enterprise's affairs.

2.  *Racketeering Activity and Fraudulent Intent*

USA Funds next argues that Bible has not plausibly alleged racketeering activity. "Racketeering activity" is defined

in 18 U.S.C. § 1961(1)(B) to include mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343. "The elements of mail fraud … are: '(1) the defendant's participation in a scheme to defraud; (2) defendant's commission of the act with intent to defraud; and (3) use of the mails in furtherance of the fraudulent scheme.'" *Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 298–99 (7th Cir. 2003), quoting *United States v. Walker*, 9 F.3d 1245, 1249 (7th Cir. 1993). The elements of wire fraud are the same except that it requires use of interstate wires rather than mail in furtherance of the scheme. E.g., *United States v. Green*, 648 F.3d 569, 577–78 (7th Cir. 2011).

Bible alleges both mail and wire fraud. Her allegations are subject to Federal Rule of Civil Procedure 9(b), which requires her to plead fraud with particularity. E.g., *Slaney v. Int'l Amateur Athletic Federation*, 244 F.3d 580, 597 (7th Cir. 2001). As a result, Bible "must, at a minimum, describe the two predicate acts of fraud with some specificity and state the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations." *Id.*

Bible's fraud allegations are based on the form default letter and rehabilitation agreement. According to the amended complaint, USA Funds, through its agent GRC, mailed the default letter telling Bible that her loan was in default. The letter said that her "current collection cost balance" and "current other charges" were zero. Like the default letter, the rehabilitation agreement, which was faxed, said that her "current collection cost balance" and "current other charges" were zero. She alleges that USA Funds uses form documents

substantially similar to the default letter and rehabilitation agreement in its dealings with thousands of other borrowers who have defaulted on their loans.

Bible's theory of fraud is that the statements in the default letter and rehabilitation agreement that her "current collection cost balance" and "current other charges" were zero were false, misleading, or contained material omissions. They implied that collection costs would not be assessed against her if she promptly agreed to enter into a repayment program. According to the amended complaint, these statements were designed to deceive her into entering into the rehabilitation program by concealing the fact that thousands of dollars in collection costs would be imposed by the guaranty agency before she had completed the rehabilitation process.

USA Funds argues that Bible has not plausibly alleged fraud because the collection costs were permitted by federal regulations and because she has failed to allege that USA Funds intended to deceive her. Neither argument can justify dismissal under Rule 12(b)(6). Whether Bible can eventually come forward with evidence of fraudulent intent is a question for the district court on remand.

As discussed above, the collection costs were not permitted by federal regulations, at least as interpreted by the Secretary of Education. In addition, even if the costs had been permitted by the regulations, Bible alleges that USA Funds misled her in its correspondence leading to her agreeing to the repayment program. We recognize that the correspondence to Bible signaled that collection costs could be assessed in the future. Yet that same correspondence said that she owed no collection costs, which could reasonably be under-

stood as implying that there would be nothing to add in the future. A Rule 12(b)(6) motion to dismiss is not a suitable procedure for determining that these documents could not possibly have been misleading to Bible or other borrowers like her.

The question of USA Funds' intent also cannot be decided on the pleadings. At this stage of the litigation, Bible has plausibly alleged that USA Funds intended to deceive her. See Fed. R. Civ. P. 9(b) (fraudulent intent "may be alleged generally"). She alleges that it sent her a form saying that her collection costs were zero and that it made this representation intending to induce her to enter into a repayment program by hiding that she would be forced to pay over $4,500 in collection costs if she did. These representations could be deemed literally false. Even if they could avoid literal falsity, omission or concealment of material information can be sufficient to constitute mail or wire fraud. See *United States v. Morris*, 80 F.3d 1151, 1161 (7th Cir. 1996) ("We reiterated, moreover, that the statutes apply not only to false or fraudulent representations, but also to the omission or concealment of material information, even where no statute or regulation imposes a duty of disclosure."); *Emery v. American General Finance, Inc.*, 71 F.3d 1343, 1348 (7th Cir. 1995); *United States v. Biesiadecki*, 933 F.2d 539, 543 (7th Cir. 1991); *United States v. Keplinger*, 776 F.2d 678, 697 (7th Cir. 1985).

The rehabilitation agreement warned Bible that collection costs could be capitalized at the time of rehabilitation by the new lender. See App. 139 ("Collection costs may be capitalized at the time of the Loan Rehabilitation by your new lender, along with outstanding accrued interest, to form one new principal amount."); *id.* ("By signing below, I under-

stand and agree that the lender may capitalize collection costs of 18.5% of the outstanding principal and accrued interest upon rehabilitation of my loan(s).”). One straightforward reading of this language is that it authorized the new lender—not the guaranty agency—to capitalize *existing collection costs*, not to impose new ones, and then only after rehabilitation is complete (i.e., after the guaranty agency has sold the loan to a private lender).

At this preliminary pleading stage, we do not know USA Funds’ state of mind when it sent the default letter or rehabilitation agreement. Bible has plausibly alleged that the statements in the default letter and the rehabilitation agreement were designed to induce her to enter into the repayment agreement while concealing that she would be assessed over $4,500 in collection costs if she did so. Her allegations of racketeering activity should survive the Rule 12(b)(6) motion to dismiss.[8]

### 3. *Pattern*

We turn next to USA Funds’ argument that Bible has failed to allege a pattern of racketeering activity. “A pattern of racketeering activity consists, at the very least, of two

---

[8] On the RICO claims, USA Funds repeats the same argument it made on Bible’s breach of contract claim, contending that she has failed to allege an injury. For the same reasons, we reject this contention. Bible’s alleged injury is that she made monthly payments for costs she did not owe, which constitutes a financial loss. Nothing more is required to plead an injury under § 1962(c). See *Haroco, Inc. v. American Nat’l Bank & Trust Co. of Chicago*, 747 F.2d 384, 398 (7th Cir. 1984) (holding that plaintiffs’ allegations of excessive interest charges resulting from defendants’ alleged fraudulent scheme to overstate the prime rate satisfied the injury requirement), *aff’d*, 473 U.S. 606 (1985).

predicate acts of racketeering committed within a ten-year period." *Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466, 472 (7th Cir. 2007), citing 18 U.S.C. § 1961(5). To prove a pattern, Bible will need to satisfy the "continuity plus relationship" test, which requires that the predicate acts be related to one another (the relationship prong) and that they pose a threat of continued criminal activity (the continuity prong). *Id.* at 473, quoting *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992). The relationship prong is satisfied "if the criminal acts 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011), quoting *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240 (1989). The continuity prong is satisfied by showing either that the criminal behavior, although it has ended, was so durable and repetitive that it "carries with it an implicit threat of continued criminal activity in the future," *Midwest Grinding Co.*, 976 F.2d at 1023, or that the past conduct "by its nature projects into the future with a threat of repetition," *H.J. Inc.*, 492 U.S. at 241.

Whether or not Bible needed to plead details of her pattern theory, cf. *Runnion v. Girl Scouts*, 786 F.3d at 528, Bible's allegations satisfy the relationship-plus-continuity test. She alleges that USA Funds, through its enterprise, unlawfully imposed collection costs on thousands of borrowers in default in the same manner it did to her. She alleges that USA Funds has sent the form document that became the rehabilitation agreement in this case more than 100,000 times over a period of several years. Bible also alleges that the conduct at issue is USA Funds' standard operating procedure and that it is continuous and ongoing. These allegations satisfy the

relationship-plus-continuity test. See, e.g., *Corley v. Rosewood Care Center, Inc.*, 142 F.3d 1041, 1050 (7th Cir. 1998) (relationship-plus-continuity test satisfied where plaintiff alleged defendant systematically overcharged residents at several nursing homes).

### 4. *Preemption*

We have one last loose end to tie up: the district court determined that Bible's RICO claim was "preempted" by the Higher Education Act. See *Bible v. United Student Aid Funds, Inc.*, 2014 WL 1048807, at *10. It is well settled that federal law does not preempt a federal law claim alleging a violation of another federal statute. Preemption is limited to conflicts between federal and state law. The alleged preclusion of a cause of action under one federal statute by the provisions of another federal statute is another issue entirely. See *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. —, 134 S. Ct. 2228, 2236 (2014).

Realizing that the HEA does not preempt the RICO claim, USA Funds argues instead that the absence of a private right of action under the HEA precludes Bible's RICO claim because Bible's RICO theory alleges only a violation of the HEA. USA Funds relies principally on *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1226–27 (11th Cir. 2002) (per curiam), and *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, No. 12 C 204, 2012 WL 3061859, at *4 (N.D. Ill. July 26, 2012), *aff'd on other grounds*, 719 F.3d 849 (7th Cir. 2013), for the proposition that non-compliance with a regulatory statute that does not itself provide a private right of action necessarily forecloses any RICO claim based on that non-compliance.

We are skeptical of this legal principle (our court has never adopted it), but we need not decide that question now because it is not presented by Bible's allegations. USA Funds' argument simply mischaracterizes Bible's theory. Her RICO claim is not based on regulatory non-compliance. It is based on alleged misrepresentations and deception in the default letter and the rehabilitation agreement. Even if the regulations permitted USA Funds to assess the collection costs, Bible alleges that USA Funds committed fraud by concealing that these collection costs would be imposed when it sent the default letter and the rehabilitation agreement. Thus, Bible's RICO claim does not necessarily require her to prove that USA Funds violated the HEA or its regulations, even if such proof might strengthen her claims.[9] Even if we agreed with *McCulloch* and the district court in *United Food & Commercial Workers* on this issue, neither decision considered this alternative theory Bible is pursuing. See *McCulloch*, 298 F.3d at 1226–27 (lenders' failure to comply with HEA disclosure obligations was not actionable under RICO); *United Food & Commercial Workers*, 2012 WL 3061859, at *4 (noting that plaintiff's RICO claim depended on violation of regulatory statutes referenced in complaint). The absence of a private

---

[9] Suppose discovery or a former employee showed that USA Funds included certain language in the default letter or rehabilitation agreement to hide the extent of its non-compliance with the regulations. That might indicate that USA Funds intended to defraud borrowers, who might have reasonably relied on the regulatory framework to protect them. The point for our purposes, though, is that a violation of the HEA and its regulations is not essential to Bible's fraud claims. Even if the collection costs were permitted by the regulations, Bible's theory is that statements in the form documents sent to her were misleading.

right of action under the HEA itself does not preclude Bible's RICO claim.

*Conclusion*

Neither of Bible's claims is preempted or otherwise displaced by federal law, and she has plausibly alleged all of the elements of both claims. The judgment of the district court is REVERSED and the case is REMANDED for further proceedings.

FLAUM, *Circuit Judge*, concurring in part and concurring in the judgment.

I join in full Judge Hamilton's analysis of USA Funds' preemption argument and Bible's RICO claim. With respect to Bible's breach of contract claim, I agree with the portion of the analysis that defers to the Secretary of Education's interpretation of the statute and corresponding regulations. However, I am unable to join subsection II.A.1.b.i of Judge Hamilton's opinion, which offers an alternative ground for holding that USA Funds was prohibited from assessing collection costs against Bible—that is, that the text of the regulations unambiguously supports Bible's interpretation of the statutory and regulatory scheme. Instead, I find the regulatory landscape sufficiently complex to merit deference to the agency's reasonable interpretation.

In order to bring Bible's rehabilitation agreement within the purview of 34 C.F.R. § 682.410(b)(5)(ii)'s prohibition on the imposition of collection costs, we are necessarily required to infer that Bible's rehabilitation agreement qualifies as a "repayment agreement on terms satisfactory to the [guaranty] agency." And while Judge Hamilton assumes from the outset that "rehabilitation agreement" and "repayment agreement" are overlapping concepts, in my view, this is no small inferential leap.

Judge Manion, in his dissent, makes a strong case for the proposition that the two concepts are separate and distinct, and thus, that the repayment agreement provisions of § 682.410(b)(5)(ii) do not apply to the loan rehabilitation program described in 34 C.F.R. § 682.405. Indeed, the Department of Education's website lists "Loan Repayment" and "Loan Rehabilitation" as independent options for "getting

your loan out of default." Fed. Student Aid, U.S. Dep't of Educ., *Getting out of Default*, https://studentaid.ed.gov/sa/ repay-loans/default/get-out (last visited Aug. 5, 2015). Moreover, there is no cross-reference or other textual indication in the regulations suggesting that the rehabilitation agreements described in § 682.405 constitute repayment agreements "on terms satisfactory to the agency" under § 682.410(b)(5)(ii), such that a rehabilitation agreement might fall within the scope of § 682.410(b)(5)(ii)'s exception to the general rule that collection costs will be assessed against borrowers in default. Rather, the sole reference to collection costs in § 682.405 appears to assume the assessment of collection costs in the rehabilitation context. *See* § 682.405(b)(1)(vi)(B) (explaining that the guaranty agency must inform a borrower entering into a rehabilitation agreement "[o]f the amount of any collection costs to be added to the unpaid principal of the loan when the loan is sold to an eligible lender, which may not exceed 18.5 percent of the unpaid principal and accrued interest on the loan at the time of the sale").

Further, it is unsurprising that a rehabilitation agreement may not qualify as "satisfactory" to a guarantor. The language of § 682.410(b)(5)(ii) suggests that a guaranty agency retains discretion in determining which terms render a repayment agreement "satisfactory." Under § 682.405, however, guaranty agencies have almost no discretion in setting the terms of rehabilitation agreements: the regulation requires that a borrower's monthly repayment amount be "[r]easonable and affordable," § 682.405(b)(1)(i), and sets forth specific guidelines to which a guarantor must adhere in calculating that amount. *See* § 682.405(b)(1)(iii) ("The guaranty agency initially considers the borrower's reasonable and affordable payment amount to be an amount equal

to 15 percent of the amount by which the borrower's Adjusted Gross Income (AGI) exceeds 150 percent of the poverty guideline amount applicable to the borrower's family size and State, divided by 12, except that if this amount is less than $5, the borrower's monthly rehabilitation payment is $5."). The regulation also specifies that "[t]he agency may not impose any other conditions unrelated to the amount or timing of the rehabilitation payments in the rehabilitation agreement." § 682.405(b)(1)(vi). It is therefore no great leap to conclude that rehabilitation agreements and repayment agreements "on terms satisfactory to the agency" are mutually exclusive concepts.

On the other hand, Judge Hamilton's position that the rehabilitation agreements described in § 682.405 are a subset of the repayment agreements referenced in § 682.410(b)(5)(ii) is intuitively appealing. After all, just like other forms of loan repayment, rehabilitation offers borrowers a path back to good standing, and does not permit them to avoid eventual repayment in full. *See* § 682.405(b)(4) (explaining that "[a]n eligible lender purchasing a rehabilitated loan must establish a repayment schedule that meets the same requirements that are applicable to other FFEL Program loans of the same loan type as the rehabilitated loan").

Moreover, I am skeptical of the dissent's assertion that the regulations shield from collection costs only those borrowers who agree to immediate repayment of the full outstanding balance of their defaulted loans. The repayment agreement provision, § 682.410(b)(5)(ii), was clearly drafted with the intent to permit borrowers who have lapsed into default the opportunity to regain good standing and to avoid many of the adverse consequences—i.e., report to a

credit bureau and assessment of collection costs—associated with default. Yet to make that opportunity available only to those borrowers capable of immediately paying their outstanding loan balance in full would render this second chance illusory. Practically speaking, it would be impossible for the vast majority of borrowers in default—who presumably have defaulted on their loans as a result of their inability to make far lower monthly payments—to eliminate the entirety of their student debt (which could easily reach into the tens of thousands of dollars) in a single payment. And I think it unlikely that, in drafting this regulation, the Secretary sought to exclude nearly every borrower in default from its purview.

In sum, while I question certain aspects of each of my respected colleagues' positions, they both offer plausible readings of this complex and ambiguous regulatory scheme. I therefore believe the appropriate course of action is to accept the guidance that we sought from the Secretary of Education. Under the Supreme Court's decision in *Auer v. Robbins*, 519 U.S. 452, 461 (1997), it is generally appropriate to defer to an agency's interpretation of its own regulations, even when that interpretation is informally announced. *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2159 (2012) ("*Auer* ordinarily calls for deference to an agency's interpretation of its own ambiguous regulation, even when that interpretation is advanced in a legal brief … ."). Here, the Secretary has unequivocally advanced the position that the applicable regulations do not permit a guaranty agency to assess collection costs against a first-time defaulted borrower who timely enters into a rehabilitation agreement and fully complies with that agreement. Given the regulations' lack of clarity with respect to this issue, I cannot conclude that the Secretary's

position is either plainly erroneous or inconsistent with the regulations. *See L.D.G. v. Holder*, 744 F.3d 1022, 1029 (7th Cir. 2014). Accordingly, I join that portion of Judge Hamilton's analysis that relies on administrative deference. I note, however, that while the Secretary's amicus filing has proven helpful in resolving this dispute, an unambiguous regulatory scheme is preferable to soliciting the agency's interpretive guidance. Thus, while I accept the Secretary's proffered interpretation here, perhaps the Department might consider reexamining and revising the language of the regulations.

MANION, *Circuit Judge*, concurring in part and dissenting in part.

I agree with the court's conclusion that Bible's claims are not preempted, but I disagree that she pleaded a valid breach of contract or RICO claim. As a matter of law, United Student Aid Funds, Inc., did not breach the Master Promissory Note (MPN) and did not commit the fraud upon which Bible's RICO claim is predicated. Bible's entire theory is erected atop an erroneous equivocation, that the loan rehabilitation agreement of 34 C.F.R. § 682.405 is the same as the repayment agreement of § 682.410. I say Bible's theory because it truly is her own contrivance. There is no evidence to suggest that the Department of Education ever interpreted the regulations in the manner advanced by Bible prior to our request for an amicus brief in this case. In fact, the record reflects that the Department agreed with USA Funds' interpretation and had no cause to question USA Funds' regulatory compliance, that is, until the Department filed its amicus brief. Applying the Department's *post hoc* rule to USA Funds is both wrong and unjust. The fraud is on the guarantors and, because the Department ultimately guarantees the loans, on the taxpayer. For this and for the detailed reasons that follow, I respectfully dissent.

### A. Background

Before setting out my analysis and rebuttal to Bible's arguments and the court's opinion, it is important to understand what this case is about and how the court and I came to disagree. I provide the following background as a means of presenting the big picture.

To obtain a student loan, Bible entered into a loan agreement with Citibank. At some point she quit making payments. After about nine months of nonpayment (270 days), Citibank declared her loan in default. USA Funds, the guarantor, stepped forward and "bought" the loan. USA Funds' agent, General Revenue Corp. (GRC), offered Bible several options.[1] The first option was to pay the loan in full. Unable to pay the full amount, she declined that option. The second option, which was offered at the same time, would have given her a new payment plan that perhaps would have lowered her monthly payments and stretched out the repayment period, or she could have negotiated a lower amount. Had she exercised the first option, she would not have incurred costs nor would have the credit reporting agencies been notified of her default. Had she exercised the second option, she would have incurred costs, but would have avoided notification to the credit reporting agencies of her default. As with the first option, Bible did not have the wherewithal to exercise the second option. The third option, which was offered at the same time as the first two that she refused, was to enter into a rehabilitation agreement whereby USA Funds would sell her loans to a new lender who would establish a new repayment schedule, her default would be eliminated, and her costs capped at 18.5% of her outstanding balance.

Bible and her lawyers chose the third option and entered into negotiations for a loan rehabilitation agreement. After

---

[1] I am referring to the options GRC provided to rectify Bible's default. GRC also offered Bible opportunities to review the records pertaining to her loans and to request an administrative review of the legal enforceability or past-due status of her loans. She did not take advantage of these opportunities, and they are not the subject of this litigation.

several days of negotiations, Bible agreed to enter into the loan rehabilitation process by signing an agreement to do so. At the time of signing, Bible had accrued no collection costs. That is why the chart in the court's opinion shows zero costs. But from that time forward, costs would accrue.

To show her good-faith intention to rehabilitate her loans, Bible agreed to make monthly payments in the amount of $50.00 for a period of nine or ten months. At the end of that period, she would have shown her good faith and willingness to abide by a new repayment schedule. It should be noted that the $50.00 payments were by no means sufficient to cover the amount due each month. Rather, the payments could only cover about one-half of the interest that accrued over the rehabilitation period. After the nine- or ten-month period of good-faith payments, Bible was eligible for a new loan repayment schedule for an amount that included outstanding principal and accumulated interest and costs. The latter amounts would be capitalized into the new loan total when USA Funds sold the loan to a new lender. As best we know at this juncture, Bible's loans were sold to a new lender and, according to the court, she is current on payments under the new schedule.

The dispute in this case is confined to the issue of costs. As indicated above, when she entered into the rehabilitation agreement no costs had yet accrued. However, from that time forward, costs accrued. Presumably these costs resulted from USA Funds "buying" Bible's loans from Citibank, corresponding and negotiating with Bible over several days, preparing her loans for resale, finding a buyer, and finalizing the sale of her loans. Presumably, this process occurred dur-

ing the nine or ten months that Bible was making the good-faith payments of $50.00.

Bible now insists that USA Funds should not have charged her costs for this process. But that flies in the face of the statute, which expressly permits costs so long as they are limited to 18.5% of the new loan total. She relies instead on a novel theory that would grant her a complete exemption from costs despite the plain language of the statute. Based on her interpretation, Bible claims that USA Funds breached her loan contract and committed fraud sufficient to violate the RICO Act. But as I will demonstrate in detail below, there was no breach of contract and absolutely no fraud committed when she accepted loan rehabilitation. There is certainly no RICO violation. The court implies this by its very mild recognition of the RICO claim simply because it was recited in the complaint.

The only saving grace that the court falls back on, if there is such a thing in this case, is that the Department has submitted, at the court's invitation, an amicus brief. But that brief establishes a brand new interpretation that was not present when the events of this case unfolded. Aside from the fact that the law is not ambiguous and the Department's interpretation is unreasonable, the fact that there was no notice and opportunity to oppose the Department's substantial "revision" gives us a very good reason not to defer to the Department's interpretation.

### B.  Bible's theory relies on two fundamental errors.

With the big picture now before us, I start my analysis with the Department's new interpretation, that is, Bible's theory. Section 682.410(b)(2) requires the guarantor to

"charge a borrower an amount equal to reasonable costs incurred by the agency in collecting a loan." Bible's interpretation, now endorsed by the Department, is that a guarantor must charge a borrower "reasonable costs" *except* when the borrower agrees to loan rehabilitation within 60 days of being offered the opportunity and honors the agreement. Bible relies on the regulation's requirement that the guarantor not charge collection costs until it offers the borrower certain opportunities, chief among them the "opportunity to enter into a repayment agreement on terms satisfactory to the agency." § 682.410(b)(5)(ii)(D).

There are two fundamental errors with Bible's theory. First, the regulation's waiting period for charging costs applies to a different kind of repayment agreement than a rehabilitation agreement. Second, the regulation does not contain an exception to charging costs for any kind of repayment agreement, let alone a rehabilitation agreement. Only by relying on these errors is it possible for Bible to argue that USA Funds' assessment of collection costs was a breach of contract and that USA Funds' letter reporting Bible's current collections costs as zero was fraudulent.

The correct interpretation is this: the rehabilitation agreement is not the same as the "repayment agreement on terms satisfactory to the agency" mentioned in the administrative regulation. The two are separate, and the regulations governing each are also separate, even though the guarantors' current practice is to offer a defaulted borrower a rehabilitation agreement at the same time they offer her a repayment agreement. To avoid collection costs and a report of default, the borrower must choose the repayment agreement and either pay her balance in full or come to "terms satisfac-

tory to the agency" that do not include collection costs. The alternative rehabilitation agreement is not a "repayment agreement on terms satisfactory to the agency," and accepting it does not allow the borrower to escape collection costs and default reporting. Rather, by agreeing to loan rehabilitation instead of loan repayment the borrower incurs costs and her default is reported, but her costs will be capped at 18.5% and her default will be cleared from her credit report if she successfully completes loan rehabilitation.

### C. Loan repayment, not loan rehabilitation, offers defaulted borrowers the opportunity to avoid collection costs and default reporting.

Although Bible accepted neither loan repayment in full nor repayment through another agreement, it is necessary to review how loan repayment works in order to understand Bible's errors. Once a borrower is in default, by failing to make a monthly payment for nine months (270 days), 20 U.S.C. § 1085(l); 34 C.F.R. § 682.200(b)(1), the lender hands the loan over to the guarantor who pays the default claim. Under 34 C.F.R. § 682.410, the guarantor then has 45 days to provide the borrower with a written notice and opportunities to inspect the loan records, request an administrative review, and "enter into a repayment agreement on terms satisfactory to the agency." § 682.410(b)(5)(ii) & (6)(ii). The guarantor may not assess any collection costs against the borrower or report the borrower's default to the credit reporting agencies until it provides the borrower with the notice and opportunities. § 682.410(b)(5)(ii). The notice must, among other things, "[d]emand that the borrower immediately begin repayment of the loan," explain "that all costs incurred to collect the loan will be charged to the borrower," and ex-

plain the opportunity "to reach an agreement on repayment terms satisfactory to the agency to prevent the agency from reporting the loan as defaulted to consumer reporting agencies." § 682.410(b)(5)(vi)(D), (E) & (G). Sixty days after the guarantor has sent the notice, if the borrower has not "reach[ed] an agreement on repayment terms satisfactory to the agency to prevent the agency from reporting the loan as defaulted," then the guarantor "shall" report the borrower's default to all national credit reporting agencies. § 682.410(b)(5)(i); *cf.* 20 U.S.C. § 1080a(c)(4) (requiring only a 30-day wait before reporting default).

If the borrower agrees to a repayment agreement sufficiently acceptable to the guarantor for the guarantor to not report the default, then the guarantor will not report the borrower's default to all the national credit reporting agencies. 34 C.F.R. § 682.410(b)(5)(vi)(G); 20 U.S.C. § 1080a(c)( 4). Although the borrower may avoid the *report* of her default in this way, she is still in default and therefore must pay collection costs: "a borrower who has defaulted on a loan made under this subchapter … shall be required to pay … reasonable collection costs[.]" 20 U.S.C. § 1091a(b)(1). So, although the guarantor is prevented from charging collection costs *before* it provides the notice and opportunities, 34 C.F.R. § 682.410(b)(5)(ii), it is required to charge collection costs afterwards. Again, "the guaranty agency shall charge a borrower an amount equal to reasonable costs incurred by the agency in collecting." § 682.410(b)(2). That said, the guarantor has the discretion to not charge collection costs under a repayment agreement because the repayment agreement is "on terms satisfactory to the agency." § 682.410(b)(5)(ii)(D). Thus, the borrower may avoid collection costs either by ensuring that the guarantor does not incur collection costs, that

is, by paying the loan balance in full upon the guarantor's demand for payment, or by coming to "terms satisfactory to the agency" that do not include collection costs. *Id*.

Obviously, a "repayment agreement on terms satisfactory to the agency" requires, at most, payment in full of the outstanding balance and, at least, terms that actually stand a chance of paying off the loan. § 682.410(b)(5)(ii)(D). If the borrower pays her outstanding balance in full, then she avoids the report of default and collection costs. If she is unable to pay in full, but comes to terms that do not include collection costs, then she also avoids the report of default and collection costs. If she cannot reach such favorable terms but can still reach a repayment agreement, then she avoids the report of default but not collection costs. Finally, if the borrower declines to accept a repayment agreement (perhaps she cannot afford one), then, according to the regulations, the guarantor reports the borrower's default to the national credit reporting agencies and charges collection costs. § 682.410(b)(5)(i); § 682.410(b)(2).

### D. Loan rehabilitation is a separate opportunity, after a borrower has rejected loan repayment, to remove the loan from default status and erase the report of default.

Yet, for a borrower like Bible who cannot afford repayment there is a way out: loan rehabilitation. Loan rehabilitation is a separate program, § 682.405, for those borrowers who are unable to meet the stricter repayment obligations of § 682.410. It requires only payments that the borrower can afford; it removes the loan from collection, clears the default from the borrower's credit history, and limits collection costs to 18.5% (now 16%) of the loan's outstanding balance and

accrued interest. 20 U.S.C § 1078-6; 34 C.F.R. § 682.405. It is a lengthy process and takes as long as it took to get into default (nine months) but it allows the borrower time to get back on her feet. *Id*. However, loan rehabilitation will incur the report of default and collection costs. This is because it is only available to a borrower whose default has been (or will be) reported and whose loan is in collection, in other words, a borrower who has rejected a repayment agreement satisfactory to the guarantor.

While the post-2006 regulations may describe loan rehabilitation as a type of monthly repayment agreement (explained below), it is not "a repayment agreement on terms satisfactory to the agency" because it is not a repayment agreement that can repay the loan. § 682.410(b)(5)(ii)(D). Loan rehabilitation requires that the borrower voluntarily make nine out of ten monthly payments (which can be as little as $5.00) to demonstrate the borrower's good-faith intention to repay the loan. § 682.405(b)(1)(iii). The nine token payments alone are insufficient to rehabilitate the loan, because the loan must be sold to a new lender for it to be considered rehabilitated. § 682.405(a)(2)(ii). Only after the loan is sold to a new lender who establishes a new repayment schedule is the loan rehabilitated and back in a standard repayment status. § 682.405(b)(4). Thus, because a loan in the process of rehabilitation is still in default and under collection until it is sold to a new lender, "[a] guaranty agency may charge the borrower and retain collection costs in an amount not to exceed 18.5 percent of the outstanding principal and interest at the time of sale of a loan rehabilitated[.]" 20 U.S.C. § 1078-6(a)(1)(C) (effective July 1, 2006).

### E.  Loan rehabilitation is not loan repayment.

Central to Bible's theory is her claim that the rehabilitation agreement of 34 C.F.R. § 682.405 is the repayment agreement in 34 C.F.R. § 682.410(b)(5)(ii)(D). It is not. Although § 682.405(a)(2) states that "[a] loan is considered to be *rehabilitated* only after [t]he borrower has made and the guaranty agency has received nine of the ten qualifying payments required under a monthly *repayment agreement*," this is merely a description, not a definition. It does not allow the term "repayment agreement" in § 682.410 to be replaced with "rehabilitation agreement." A rehabilitation agreement may be a type of repayment agreement, but it is not the "repayment agreement on terms satisfactory to the agency" required by § 682.410(b)(5)(ii)(D).

There are several reasons why the two agreements are not the same. *First*, it is apparent from their differing levels of discretion. Section 682.410 requires that the guarantor offer a repayment agreement "on terms satisfactory to the [guaranty] agency." § 682.410(b)(5)(ii)(D). Quite obviously, whether the terms of a particular agreement are satisfactory to the guarantor is largely a matter of the guarantor's discretion. The Department agrees with this. Gov't. Amicus Br. 8, 15. On the other hand, the terms of a rehabilitation agreement are mandated by § 682.405(b)(1). The amount and timing of each payment are defined by the regulation, and "[t]he agency may not impose any other conditions unrelated to the amount or timing of the rehabilitation payments in the rehabilitation agreement." § 682.405(b)(1)(i)–(vi). According to Bible, every rehabilitation agreement must be a repayment agreement satisfactory to the guarantor because the guarantor accepts each agreement. But even that is mandat-

ed by the regulation: "A guaranty agency … must enter into a loan rehabilitation agreement with the Secretary. The guaranty agency must establish a loan rehabilitation program for all borrowers with an enforceable promissory note for the purpose of rehabilitating defaulted loans … ." § 682.405(a)(1).

*Second*, the history of the regulations also demonstrates that they are not the same. Section 682.405(a)(2) did not describe the rehabilitation agreement as a "repayment agreement" until September 8, 2006, but § 682.410 always used the term.

*Third*, a guarantor is prevented from *both* charging collection costs and reporting the default until it provides the borrower with the opportunity to enter into a repayment agreement satisfactory to the guarantor. § 682.410(b)(5)(ii). If a rehabilitation agreement necessarily is a repayment agreement satisfactory to guarantor, so that the guarantor is prevented from charging collection costs, then the guarantor would also be prevented from reporting the default. Yet, one of the primary purposes of loan rehabilitation is to clear the report of default from the borrower's credit history, including the default reported by the guarantor, which the guarantor must do once loan rehabilitation is complete. § 682.405(b)(3)(i); 20 U.S.C. § 1078-6(a)(1)(C). If timely acceptance of a rehabilitation agreement prevented collection costs, then it should also prevent default reporting. But if it prevented default reporting, then one of the primary purposes of loan rehabilitation would be pointless. Obviously, Bible does not argue that the timely acceptance of loan rehabilitation prevents the report of default because it would be absurd.

*Fourth*, it is unreasonable to hold that a rehabilitation agreement is "satisfactory to the agency" for actual repayment of the loan. *Id*. The loan rehabilitation's "monthly repayment agreement" is only part of the agreement. The nine token payments are used to prove the borrower's good-faith *intention* to repay the loan once it is purchased by a new lender, not to repay the loan to the guarantor. It is the new lender that sets the actual repayment schedule that will repay the rehabilitated loan. 34 C.F.R. § 682.405(a)(2)(ii), (b)(4). In Bible's case the loan rehabilitation payments did not even cover the interest accruing on her loans.

### F.   The *Barnes*/*Black* litigation does not support Bible's theory that loan rehabilitation is loan repayment.

The Department's brief in *Ed. Credit Mgmt. Corp. v. Barnes*, 318 B.R. 482 (S.D. Ind. 2004), *aff'd sub nom. Black v. Educ. Credit Mgmt. Corp.*, 459 F.3d 796 (7th Cir. 2006), does not support Bible's theory. Bible misrepresents the Department's brief in *Barnes* just as she does the regulation's description of a rehabilitation agreement. In *Barnes*, the Department intervened in a bankruptcy proceeding to defend 34 C.F.R. § 682.410(b)(2), the section of the regulation that allows a guaranty agency to charge collection costs based on a flat-rate formula. The Department was defending the regulation from the bankruptcy trustee's challenge that the use of the flat-rate formula for charging collection costs was arbitrary and capricious. Bible relies on a particular passage from the Department's brief:

> Department rules require the guarantor who acquires a loan by reason of the default of the borrower ( … ) to charge collection costs *only after providing the debtor an opportunity to contest*

> *the debt and to enter into a repayment arrangement for the debt*. 34 C.F.R. § 682.410(b)(5). The guarantor, moreover is not bound by the original loan repayment schedule, but can agree to any repayment arrangement that debtor can afford, regardless of the amount of time needed to pay the debt off under that arrangement. *See* 20 U.S.C. § 1078-6(a) (defaulter may have loan *rehabilitated* and default status cured after 12 installment payments to the guarantor); § 1078-6(b) (defaulter may regain eligibility for new student aid after six reasonable and affordable payments based on the borrower's total financial circumstances).
>
> The regulations therefore direct guarantors to charge collection costs *only* to those debtors who cause the guarantor to incur collection costs by failing to agree promptly to repay voluntarily.

Appellant's App. 55 (emphasis added; last emphasis in original).

As part of its much larger effort to prove that the regulation's use of a flat-rate formula was reasonable, the Department briefly explained that the same regulation allowed borrowers to avoid collection costs if they promptly agreed to *repay* voluntarily. In its explanation, the Department was clearly referring to the repayment agreement of § 682.410, not the rehabilitation agreement of § 682.405, as is evident from the brief's straightforward citation to § 682.410(b)(5). The Department went on to explain that the guarantor is not bound in a repayment agreement by the original repayment

schedule. According to Bible, because the Department supported this subsequent proposition with a citation to the loan rehabilitation statute, 20 U.S.C. § 1078-6, the Department was somehow explaining that a guarantor is prevented from charging collection costs if a borrower timely accepts a rehabilitation agreement. It was not.[2]

When we affirmed *Barnes*, we held that the Higher Education Act (HEA) expressly allows a guarantor to impose collection costs on rehabilitated loans:

> Nothing in the HEA prohibits a guaranty agency from assessing collection costs as a flat-rate percentage upon rehabilitation. To the contrary, the statute explicitly provides that "[a] guaranty agency may charge the borrower and retain collection costs in an amount not to exceed 18.5 percent of the outstanding principal and interest at the time of sale of a loan rehabilitated." 20 U.S.C. § 1078–6(a)(1)(C). Thus, even if Barnes's loans could have been rehabilitated through his Chapter 13 proceeding, the 18.06% that ECMC charged Barnes for collection costs

---

[2] The Department cited § 1078-6 with a "see" introductory signal, which is used when "there is an inferential step between the authority cited and the proposition it supports." THE BLUE BOOK: A UNIFORM SYSTEM OF CITATION 58 (Columbia Law Review Ass'n et al. eds., 20th ed. 2015). The citation's inferential step is that repayment agreements are like rehabilitation agreements in that they are not bound by the original repayment schedule. Whereas, Bible would have the inferential step be that rehabilitation agreements are like repayment agreements in that the borrower can avoid collection costs. For that to be the case, the citation would have had to support the sentence before the one it did.

> falls within the bounds of what is allowed un-
> der the HEA's loan rehabilitation provisions.

*Black*, 459 F.3d at 803. In so holding we did not disagree with the Department's interpretation of its rules. On the contrary, we agreed with the Department, which then told us in its brief:

> Furthermore, the Trustee's argument rests upon a mistaken assumption that rehabilitation would have enabled Barnes to pay lower collection costs. The Trustee suggests that, if Barnes has rehabilitated his loan, ECMC could not have assessed collection costs at a flat rate. According to the Trustee, ECMC could have recovered only the actual costs that it incurred in collecting Barnes' student loan during the period leading up to rehabilitation.
>
> But the regulation governing rehabilitation plainly allows a guaranty agency to assess collection costs at a flat rate as long as the rate does "not exceed" 18.5 percent. *See* 34 C.F.R. § 682.405(b)(1)(iv).

Br. for Appellee Secretary of United States Department of Education, *Black*, 459 F.3d 796, 2005 WL 3738503, at 33 (citation omitted). Neither we nor the Department recognized a special exception that would have prevented a guarantor from charging a borrower collection costs on rehabilitated loans. We plainly said that "*[n]othing* in the HEA prohibits a guaranty agency from assessing collection costs as a flat-rate percentage upon rehabilitation." *Black*, 459 F.3d at 803 (emphasis added). Nothing in the *Barnes/Black* litigation sup-

ports the theory that Bible, and now the Department, advances.[3]

---

[3] In its brief before the district court in *Barnes*, the Department made clear that guarantors must charge collection costs or those costs will be borne by the taxpayer:

> To restate the problem which the regulation addresses: the student loan guarantor must recover enough to meet its collection costs, or those costs will be charged to the taxpayer—exactly what §484A [20 U.S.C. 1091a(b)] was intended to prevent.

Appellant's App. 66. The Department also disagreed that collection costs assessed by the flat-rate formula could be unreasonable if the costs are in excess of actual costs. Its argument concerned the costs incurred by a guarantor who uses a collection contractor, such as USA Funds used GRC:

> A debtor may object that a contractor incurred only modest costs in generating a particular payment, and that the contingent fee earned by the contractor for payment exceeds the "actual costs" of collecting that amount. Such an objection misses the point: the creditor incurs a negotiated contingent fee owed to the contractor for that payment, regardless of the effort needed by the contractor to secure that particular payment. The creditor must pay the contractor, and that cost is a real expense for the guarantor, and one incurred solely because the debtor previously has failed to pay the debt. Because the guarantor incurs that fee, the guarantor can, and must, pass that real cost on to the debtor. *Debtors whose loans have been referred by guarantors to contingent fee contractors for collection action have no basis for objecting to liability for a contingent fee charged as a "flat rate" percentage of the payment recovered.*

Appellant's App. 60 (emphasis added).

### G. The regulation's collection-cost provisions contain no exemption for rehabilitated loans.

Bible's theory is contrary to the plain language of the statutes and regulations because nowhere do the statutes and regulations contemplate that "reasonable costs" equals "no costs" for borrowers who timely enter into a rehabilitation agreement. *See* 20 U.S.C. §§ 1078-6, 1091a; 34 C.F.R. §§ 682.405, 682.410. That is why we held in *Black* that "*[n]othing* in the HEA prohibits a guaranty agency from assessing collection costs as a flat-rate percentage upon rehabilitation." *Black*, 459 F.3d at 803 (emphasis added). The regulation's only exception for collection costs refers to *limiting* collection costs to 18.5% on rehabilitated and consolidated loans. § 682.410(b)(ii)(2) ("Except as provided in §§ 682.401(b)(18)(i) and 682.405(b)(1)(iv)(B)"). Plainly, collection costs cannot be limited on rehabilitated loans unless they are first allowed.

Bible's theory tries to explain this incongruity by saying that the regulations' references to collection costs refer to those borrowers who fail to timely agree to loan rehabilitation, or fail to honor the agreement. This cannot be the case. First, the regulations' references to collection costs do not refer to a borrower who fails to honor the rehabilitation agreement because the limitation applies "at the time of the loan sale," 20 U.S.C. § 1078 6(a)(1)(D(i)(II)(aa), and the loan cannot be sold unless the borrower honors the rehabilitation agreement, § 1078-6(a)(1)(A). Second, and more importantly, the references do not refer to a borrower who fails to agree to loan rehabilitation within the 60-day deadline because there is no deadline for loan rehabilitation.

The regulatory scheme does not require that a guarantor offer loan rehabilitation, only that the guarantor have a program where "[a] borrower *may request* rehabilitation of the borrower's defaulted loan held by the guaranty agency." § 682.405(b)(1) (emphasis added). It was not until 2010 that the regulation was amended to require guarantors to "*[i]nform* the borrower of the options that are available to the borrower to remove the loan from default, including an explanation of the fees and conditions associated with each option." § 682.410(b)(5)(vi)(M) (effective July 1, 2010; emphasis added). When the Department finalized the regulations in 2006, they said, "We believe the regulations accurately reflect the HEA and Congressional intent. *Borrowers must request, or in some fashion initiate, loan rehabilitation* so that the period during which the 9 qualifying payments must be made is clear for both the guaranty agency and the borrower." 71 Fed. Reg. 64389 (Nov. 1, 2006) (emphasis added).

Thus, the regulations do not require a guarantor to offer rehabilitation, but merely to make rehabilitation available. If there is no requirement to offer rehabilitation, and therefore no deadline, then there is nothing to gauge whether a borrower has "timely" or "promptly" entered into a rehabilitation agreement. This is the whole reason for Bible's equivocation between a rehabilitation agreement and a repayment agreement satisfactory to the guarantor. Bible needs the repayment agreement's deadline to create the special category of borrowers who "promptly" enter into rehabilitation agreements. But as I have explained at length above, the rehabilitation agreement of § 682.405 is not a repayment agreement satisfactory to the guarantor of § 682.410. Without Bible's fictitious special category, the regulations allow costs on rehabilitated loans without exception.

Simply put, nowhere do the statutes or regulations say that collection costs may be assessed except when, or unless, the borrower timely agrees to loan rehabilitation and honors that agreement. Bible's interpretation would turn loan rehabilitation into a kind of at-will deferment. A borrower could make no payment on her loans for nine months and then make only token payments for another nine months, all without collection costs, only to have her loan purchased by a new lender and the default erased from her record. This was not what Congress intended. As explained by the Department in 2006:

> We believe the regulations accurately reflect the HEA and Congressional intent. … Additionally, a reasonable and affordable payment amount needs to be established, and the consequences of loan rehabilitation, *such as the addition of collection costs to the rehabilitated loan amount*, the post-rehabilitation payment period and the likely increased payment amount, need to be explained to the borrower.

71 Fed. Reg. 64389 (emphasis added).

### H. Bible takes advantage of the guarantors' practice of offering loan rehabilitation at the same time as loan repayment.

Bible obfuscates the regulations in another way. She takes advantage of the fact that USA Funds offered her loan rehabilitation at the same time as it offered her loan repayment. The regulations do not require that the guarantor immediately offer a defaulted borrower loan rehabilitation. Nevertheless, the current practice—at least as practiced by USA

Funds in this case—appears to be for the guarantor to offer loan rehabilitation at the same time it offers loan repayment. The Department endorses this method of giving the borrower a choice. Its website states:

> You have several options for getting your loan out of default. These include
>
> • loan repayment
>
> • loan rehabilitation, and
>
> • loan consolidation.

Addendum to Appellee's Response to Gov't Amicus Br. The Department clearly describes loan repayment and loan rehabilitation as separate options and gives the impression that they are options provided concurrently. (Loan consolidation is also a separate option, but is not at issue in this case.) The Department's description of loan repayment does not mention collection costs, whereas its description of loan rehabilitation does. *Id*. ("Outstanding collection costs may be added to the principal balance."). The Department's description of loan rehabilitation includes collections costs because the regulations allow them. 71 Fed. Reg. 64389 ("the consequences of loan rehabilitation, such as the addition of collection costs to the rehabilitated loan amount … need to be explained to the borrower").

When a guarantor offers loan rehabilitation at the same time as loan repayment there is an incentive for the borrower to choose loan rehabilitation because it is less expensive in the short term. But by choosing loan rehabilitation, the borrower necessarily rejects loan repayment. Because the borrower rejects loan repayment, the guarantor must report the default and assess collection costs. And, remember that the

guarantor is prohibited from charging collection costs before offering loan repayment. So, when the guarantor offers loan rehabilitation at the same time as loan repayment it is not allowed to assess collection costs until the borrower chooses loan rehabilitation, thereby rejecting loan repayment. If the borrower has not previously defaulted, then collection costs will be zero when loan rehabilitation is offered.

This practice is entirely permissible under the regulations as long as the guarantor meets the separate requirements for each option. Borrowers are not harmed by the practice, so long as they receive the necessary warnings regarding collection costs and other consequences. As can be seen from an examination of GRC's correspondence with Bible, this was the practice followed here.

## I.  Bible fails to state a claim for either breach of contract or RICO because USA Funds and GRC complied with the regulations.

The default letter sent by GRC to Bible stated: "Without a dispute, failure to pay the account in full, agree to a satisfactory repayment arrangement, or utilize another recovery option as outlined on the attached insert, may result in additional collection efforts." Appellant's App. 131. At the top of the attached insert was a call-out box which stated in bold type: "If you are unable to pay in full the outstanding balance on your defaulted loan(s), call a representative to find out which of the following additional options you qualify for." *Id*. at 133. The insert then listed three additional options: 1) "Alternative Payment Arrangements," 2) "Loan Rehabilitation," and 3) "Loan Consolidation." *Id*.

The first option, "to pay in full the outstanding balance on [the] defaulted the loan(s)" and the additional option, "Alternative Payment Arrangements," were both the "repayment agreement on terms satisfactory to the agency" of § 682.410. By paying the outstanding balance in full, Bible would have avoided collection costs and the report of default.[4] By choosing "Alternative Payment Arrangements," Bible would have avoided the default but not collection costs. USA Funds' description of the "Alternative Payment Arrangements" stated that "[a] portion of each payment received from you will be allocated to pay collection costs." *Id*. But Bible chose neither of those options. Instead of choosing loan repayment, Bible chose loan rehabilitation, which USA Funds described as "the opportunity to resolve a loan default and improve your credit record by removing the guarantors' report of your loan default." *Id*. GRC also informed Bible that "*[a]s part of your eligibility for loan rehabilitation*, you will be assessed collection costs at a reduced rate of 18.5% of the outstanding balance at the time your loan is purchased by an eligible lender, and the purchasing lender may add these costs to your outstanding loan principal." *Id*. (emphasis added). By choosing loan rehabilitation Bible rejected loan repayment, thereby incurring the collection costs permitted under the statutes and regulations.

---

[4] Bible's MPN included an acceleration clause that made the entire unpaid balance of Bible's loan immediately due and payable in the event of default. Appellant's App. 122. It also states that "the guarantor may purchase [her] loans and capitalize all then-outstanding interest into a new principal balance, and collection fees will become immediately due and payable." *Id*.

Both the default letter and the loan rehabilitation application letter listed Bible's current collection-cost balance on each of her four loans as zero because it was. Appellant's App. 132, 137. USA Funds was prohibited from charging collection costs until Bible acted on its offer of loan repayment, or the offer expired. 34 C.F.R. § 682.410(b)(5)(ii). Had Bible paid her account in full she would have avoided collection costs, but she did not, she chose loan rehabilitation. When she chose loan rehabilitation she rejected loan repayment and collection costs began accruing. By choosing loan rehabilitation Bible agreed "that the lender may capitalize collection costs of 18.5% of the outstanding principal and accrued interest upon rehabilitation of my loan(s)." Appellant's App. 139.

USA Funds abided by the statutes and regulations. USA Funds neither breached the contract nor committed fraud. For this reason, Bible's breach of contract claim and RICO claim should be dismissed.

**J.	We cannot give deference to the Department's interpretation because the statutes and regulations unambiguously allow collection costs and because the Department's interpretation is unreasonable, inconsistent with prior interpretations, and without warning.**

The Department—in response to our request for an amicus brief—claims that it has always interpreted its regulations to provide an exception to collection costs when a borrower promptly enters into a rehabilitation agreement and complies with that agreement. It also claims that its interpretation deserves deference under *Chevron, U.S.A., Inc. v. Natu-*

*ral Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and *Auer v. Robbins*, 519 U.S. 452 (1997).

The Department's interpretation is not entitled to deference. First, Congress may have left it up to the Department to define "reasonable collection costs," but the Department has already clearly defined the term, 34 C.F.R. §§ 682.410(b)(2)(i), 682.405(b)(1)(vi)(B), and we need look no further. The regulations define "reasonable collections costs" with a flat-rate formula that must be capped at 18.5% of the principal and accrued interest for rehabilitated loans. *Id*. *See also* Department's letter to guaranty agency directors, *infra* at 79. The definition the Department now advocates does not comport with those regulations. Instead, the Department's interpretation amounts to a new rule that determines *when* costs will be charged for rehabilitated loans, not *what* those costs will be. That was not a gap "explicitly left [] for the agency to fill." *Chevron*, 467 U.S. at 843. Congress stated quite explicitly that a guarantor may charge the borrower collection costs on a rehabilitated loan. 20 U.S.C. § 1078-6(a)(1)(D)(i)(II). We are not allowed "to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000). Because the regulation is not ambiguous regarding collection costs for rehabilitated loans, and because the Department's interpretation is plainly erroneous and inconsistent with the regulation, it is not entitled to deference. *Id.*; *Auer*, 519 U.S. at 461.

Moreover, the Department's amicus brief demonstrates that its interpretation is entirely new and inconsistent with its prior interpretations. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994) ("an agency's interpretation of a

statute or regulation that conflicts with a prior interpretation is entitled to considerably less deference than a consistently held agency view" (quotation marks omitted)). The Department's reasoning appears to be taken wholesale from Bible's briefs with supporting material that actually undermines its case. There is nothing in the record that demonstrates that the concept existed prior to Bible's attorneys filing this class action. (As I explained above, the Department's brief in *Barnes* did not advocate the position it now holds.)

In an effort to provide some record that the Department developed this interpretation before Bible's lawsuit, the Department provided two letters: a 1994 general letter to the directors of guaranty agencies and a 1997 letter to the vice president of Texas Guaranteed Student Loan Corporation. Although the excerpts are long, I include them to show how unreasonable and inconsistent the Department's interpretation is. From the 1994 general letter addressed to the guaranty agency directors:

> [W]e have concluded that the amount of the collection costs currently assessed borrowers as reasonable under 34 CFR 682.410(b)(2) is not reasonable when the borrower has shown the initiative to address the default through one of these two programs [loan rehabilitation and loan consolidation]. Therefore, the Department has decided to modify its earlier policy guidance to restrict *the amount of collection costs that will be considered "reasonable" under these circumstances to be an amount that does not exceed 18.5 percent of the outstanding amount of principal and accrued interest on the loan at the time the agency*

> *arranges the lender purchase to rehabilitate the loan* or certifies the pay-off amount to the consolidating lender. This percentage is consistent with the percentage a guaranty agency is allowed to retain under the loan rehabilitation program at the time of lender purchase.

Gov't Amicus Br. 3a (emphasis added). This letter contains no mention of an exception for borrowers who promptly agree to rehabilitation, and it explicitly states that collection costs on rehabilitated loans that do not exceed 18.5% of the outstanding balance and accrued interest are "reasonable."

Now, from the 1997 letter, which the Department sent to the loan corporation's vice president in response to his question concerning collection costs for loan repayment agreements under § 682.410(b)(5)(ii)(D):

> The Department agrees with your interpretation of 34 CFR 682.410(b)(5)(ii)(D) and its interaction with §682.410(b)(2)(i). This provision of the regulations provides the borrower an opportunity to enter into a satisfactory repayment agreement before the agency either reports the default to a credit bureau or assesses collections costs against the borrower as required in §682.410(b)(2). *You also are correct that "terms satisfactory to the agency …" does not require that the loan be paid in full and provides the agency with discretion in establishing a satisfactory repayment agreement with the borrower.* If the agency obtains a signed repayment agreement from the borrower within the 60-day period, and the borrower begins to make payments, the agency

> is *not required* to assess the borrower collection costs. Collection costs related to the default would be assessed only if the borrower failed to continue to make payments by the repayment agreement.

Gov't Amicus Br. 1a (emphasis added). This letter does not concern loan rehabilitation at all. Instead, it confirms that while § 682.410(b)(2) requires the guarantor to charge collection costs, the provision requiring a "repayment agreement on terms satisfactory to the agency" grants the guarantor the *discretion* to not charge costs. That is a far cry from providing an exception for borrowers who promptly enter into a rehabilitation agreement and comply with that agreement. In fact, the proper inference from the Department's letter is that, since § 682.405 does not grant the guarantor the same discretion as § 682.410(b)(5)(ii)(D) does, the guarantor *must* charge collection costs on rehabilitated loans.

To accept the Department's extraordinary position requires us to hold that a *single* letter to an assistant vice president of *one* guaranty agency explaining that the agency has the *discretion not* to charge collection costs under a *repayment agreement* constitutes sufficient notice for the rule that *all* agencies are *prohibited* from charging costs on *rehabilitated loans*. That is hardly the kind of "fair warning" required of the Department, especially since Bible seeks to "invoke the [Department's] interpretation of ambiguous regulations to impose potentially massive liability on [USA Funds] for conduct that occurred well before that interpretation was announced." *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2167 (2012) (quotation marks omitted).

The Department's recent July 10, 2015, letter purporting to "restate and clarify the rules" (provided to the court by the Department as a "citation of additional authority") is nothing short of an admission that the Department's rule is entirely new. Ultimately, the Department is not interpreting the regulations. Instead,

> What [the Department] claims for itself here is not the power to make political judgments in implementing Congress' policies, nor even the power to make tradeoffs between competing policy goals set by Congress. It is the power to decide—without any particular fidelity to the text—which policy goals [the Department] wishes to pursue.

*Michigan v. E.P.A.*, 135 S. Ct. 2699, 2713 (2015) (Thomas, J., concurring) (citation omitted). This raises serious constitutional questions.

The Department's interpretation is not entitled to deference. Furthermore, even if the Department truly interpreted the statutes and regulations prior to the events of this case as it claims, we cannot apply the interpretation to USA Funds. To subject USA Funds—indeed, an entire industry—to RICO liability based on a rule that was never enforced—and only recently announced—is manifestly unjust.

For all of these reasons, I respectfully dissent.